STATE OF IOWA, Appellee, v. FERN REYNOLDS, Appellant.

HOMICIDE: Verdict on Conjecture. Evidence held wholly insuf-
1   ficient to sustain a verdict that defendant had aided, abetted,
    or encouraged the murder of her infant child.

CRIMINAL LAW: Presumed Coercion of Wife. Whether a wife
2   will be shielded from responsibility for murder by the pre-
    sumption that she acts, while in the presence of her husband,
    under his coercion, *quaere.*

*Appeal from Lee District Court.*—RALPH OTTO, Judge.

OCTOBER 19, 1920.

THE accused was indicted for murder in the first degree, and convicted of manslaughter. She appeals.—*Reversed and remanded.*

*R. D. Robinson, R. N. Johnson,* and *E. C. Weber,* for appellant.

*H. M. Havner,* Attorney General, *F. C. Davidson,* Assistant Attorney General, and *Shelby Cullison,* for appellee.

LADD, J.—The accused was married to Orville Reynolds, January 1, 1918, and to them was born a female child, February 17th following. It died shortly before midnight of March 9th of the same year. Both she and

1. HOMICIDE: verdict on conjecture.

her husband are charged with having caused its death, and therein to have committed murder in the first degree. The husband pleaded guilty, and was sentenced accordingly. Thereafter, the wife was put on trial, and convicted of manslaughter. The main issue for our determination is whether the evidence was sufficient to carry the issues as to her guilt to the jury. Both testified that she was in no manner connected with the killing. Each appears to have been about 22 years of age. They had been engaged for several years prior to their marriage. She had graduated from the high school at Galesburg, Illinois, and had taught, during the two years following. The match was opposed by his relatives. Immediately after the marriage, they began housekeeping in rooms leased to them in Fort Madison by Mrs. Moyer, and he entered the employment of an ice company. The child was born at a hospital, where she remained 12 or 13 days after the birth, and then returned to the rooms with her baby, whom she had named Florence Irene. The child seemed to have been in ordinary health, save that it had a mark, as though burned, down one side of its face and on the chin; its lip was blistered; and there was a blister in the top of its mouth, for about a week prior to its death. The accused explained this to Mrs. Moyer and her daughter by

saying: "I don't know, I must have had the milk too hot."
The story of accused was that she and her husband retired
shortly after 8 o'clock on Saturday evening, March 9th, with
the child between them; that the witness awoke shortly
after 10 o'clock in the evening, and fed the child from a bot-
tle, and then went to sleep, and, when she awoke again, dis-
covered that the child was cold; that she directed her hus-
band's attention to this, but did not remember what he said;
that she "got up, lit the light, and looked and found that
she was dead. I don't remember just what I did then, after
I found the child was dead. I told him that I wanted him to
take her to an undertaker, and he told me he would do so.
He then took the child away." She testified further that
she had not seen any carbolic acid about the house, and did
not know how it appeared; that she was preparing to visit
her and his folks in Galesburg, Illinois; that her mother had
been with her at the hospital, and later on her return to the
rooms, the last visit being from Monday till Thursday be-
fore the child's death. On cross-examination she told of
taking the body to the kitchen, after discovering the child's
death, and of having washed and dressed it; and that, after
so doing, she told her husband to take it to the undertaker;
that he carried the body away in his arms; that she did not
know until the following day that her husband had taken
the body into Illinois. The husband swore to having bought
carbolic acid in the name of Orville Walker; that he left it in
the kitchen (one of their rooms), without hiding it; that he
was awake when the baby was fed; that, shortly before
midnight, he took the child in his arms, and gave it the car-
bolic acid from the bottle he had purchased, having placed
said bottle under the bed before retiring; that he had pur-
chased this for the purpose of using in taking the child's
life; that his wife, at the time, had her face towards the
wall, and gave no indication of being awake, but awoke 4 or
5 hours afterwards, and discovered that the baby was dead;
that he did not remember saying that it was smothered; that
he placed the body in a box, and carried it from the building
before daylight over the bridge, and left it in Illinois near

the river, and on the following morning, brought it back, at the instance of the chief of police; that he returned to their rooms, immediately after carrying the body away, but that neither of them went to bed; that they had supper, Sunday evening, with the Englishes, in pursuance of a previous engagement; that he hated the baby, and did not want to take it where he was known; and that he never talked to his wife about taking it back to Galesburg, Illinois, though they had planned to visit there, sometime during the following week. Mrs. Moyer, of whom the rooms were rented, testified that she saw the baby daily, after it came from the hospital; that the defendant and her husband came to her room, about 8 o'clock Sunday morning, March 10th, when the accused exclaimed, "Mrs. Moyer, we had to give our little girlie up;" and, to Mrs. Moyer's remark that she did not understand what she meant, added, "Oh, Mrs. Moyer, we had to give our little girlie up;" and again, upon Mrs. Moyer's saying that she did not understand, declared, "We smothered our little girlie last night;" and, when Mrs. Moyer suggested going upstairs, she answered, "Oh, I made him take her away, I couldn't bear to have her in the house;" and explained the reason for not calling her, by saying, "Mrs. Moyer, you have always been so good to me, and I thought it was too much trouble;" and that she informed Mrs. Moyer that the body was "at the undertaker's parlors, and they could not have a funeral, because she could not bear to go." Mrs. Moyer testified further that, on Sunday morning, when the accused and her husband came down, the latter told her that "he woke up during the night, and found the baby dead. She was standing near him at the time. They said they didn't know what time it happened. She said she washed and dressed the baby. After this, Orville Reynolds said, he had taken the baby to the undertaker's parlors. She did not seem to be in deep grief," and, during the breakfast and dinner, they did not talk, except as they were spoken to. Mrs. Moyer's testimony was corroborated by that of her daughter, Mrs. English, who had known the two in Illinois, testified that the accused and her husband

took supper with her on Sunday evening, in pursuance of a previous invitation, and related that, when they came, she expressed disappointment that the baby was not brought, to which the accused responded: "The baby went away last night. * * * We had to put her away." To the inquiry, "Is the baby dead?" she answered "Yes;" and to the further inquiry of the witness as to "what happened," she said: "I don't know, unless it got too warm. Orville threw his arm over it." The witness described the conduct of accused as indicative of unusual grief.

Other evidence was adduced, tending to show that the accused was of good character, and that the death of the child was caused by the administration of poison, or by strangulation.

Such is the evidence upon which the finding of guilt rests. We are of opinion that it was insufficient to warrant the conclusion that the accused committed the crime charged. Though she may have said that "we smothered," this appears to have had reference to the cause of the child's death, and not to have been intended as saying that this was purposely done. If guilty at all, this must have been in abetting, advising, aiding, or encouraging; for nothing in the record indicates any physical violence on her part. Even if it were conceded that the obligation to protect her child did warrant the conclusion that, if present, and making no effort to do so, she must have been found to encourage what her husband did, this was obviated by the showing that (1) she was not consciously present, and (2) that, though consciously present, there was no evidence that she did not meet the obligation mentioned. She testified that she was asleep during the period when her husband must have murdered the child, and this was corroborated by the latter. This was uncontradicted, and even though rejected by the jury, a different statement of facts was not shown from which the inference is to be drawn that she was present in the room where the offense was committed, or that, if present, she did not meet the obligation which both nature and the law imposed upon her. Neither he nor anyone else testi-

fied that the crime was committed in the presence of the accused, and she was not required, if she observed him moving the child, to suspect wrongdoing on his part. If, then, it could be said that these witnesses testified falsely as to what happened, it was not open for the jury to imagine or suppose a state of facts, without evidence justifying a conviction. For all that appears, he might have taken the child into the kitchen to perpetrate the crime, and away from the wife. But it will not do, when the evidence establishes a state of facts negativing guilt, to substitute another, without evidence justifying conviction. Were there any proof from which failure to discharge the duty of shielding her child from harm might be inferred, we should have an entirely different question. If the killing did not happen as they testify, how did it happen? Did he kill it in another room, away from his wife, and without her knowledge, or was she present, and a witness to the transaction? The record makes no answer. Conviction for crime cannot rest on conjecture alone, but must be supported by proof justifying the deduction of guilt.

What we have said does not proceed on the theory that the accused is presumed, in the absence of evidence to the contrary, to have acted under the coercion of her husband. The wife was not exempted from the re-

2. CRIMINAL LAW: presumed coercion of wife. sponsibility for murder on this ground at the common law; and the ruling in *State v. Kelly*, 74 Iowa 589, is contrary to the great weight and current of authority. See *Bibb v. State*, 94 Ala. 31 (33 Am. St. 88), and valuable note; *Morton v. State*, 141 Tenn. 357 (4 A. L. R. 264), and note in which all the cases are collected; 21 Cyc. 1355. In view of the numerous statutes emancipating women, and the recent amendment to the Constitution of the United States, conferring the right of suffrage, the rulings on exemption of married women on the ground of presumed coercion by their husbands should be reviewed and restated. As the question is not necessarily raised in this record, we defer this until the issue is fairly raised. Since we find the evi-

dence insufficient to support the conviction, it is unnecessary to consider other questions argued.

The judgment is reversed and the cause remanded.— *Reversed and remanded.*

WEAVER, C. J., STEVENS and ARTHUR, JJ., concur.