**Joyce Marie MICHAEL, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 9638.**

United States Court of Appeals
Tenth Circuit.

April 16, 1968.

Before MURRAH, Chief Judge, PICKETT, Senior Circuit Judge, and DELEHANT, Senior District Judge.*

DELEHANT, Senior District Judge.

On June 6, 1966, the United States Attorney for the District of Kansas, by Guy L. Goodwin, Assistant United States Attorney for such district, and after due waiver by Joyce Marie Michael, the Appellant, and David Eugene Breeze (see Rule 7, (a) and (b), Federal Rules of Criminal Procedure), filed in the United States District Court for the District of Kansas, against Joyce Marie Michael, the Appellant herein, and one David Eugene Breeze, as defendants, a single information. The information is brief; and of it the following is a true copy:

William E. Glenn, Topeka, Kan., for appellant.

Guy L. Goodwin, Asst. U. S. Atty. for District of Kansas (Newell A. George, U. S. Atty., on the brief), for appellee.

"IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(Wichita Docket)

| UNITED STATES OF AMERICA, Plaintiff | Criminal Action No. W-CR-758 (18 U.S.C. 1381, 2) |
| vs | |
| JOYCE MARIE MICHAEL and DAVID EUGENE BREEZE, Defendants | |

INFORMATION

The United States Attorney charges:

Continuously from on or about March 15, 1966, until on or about May 6, 1966, in the District of Kansas and within the jurisdiction of this court,

JOYCE MARIE MICHAEL and
DAVID EUGENE BREEZE

wilfully did harbor, conceal and assist James Warren Michael, who had deserted from the Armed Forces of the United States, knowing him to have deserted therefrom, in that they obtained and rendered to James Warren Michael at Rural Route 3, Cherryvale, Kansas, protection, sustenance and services as might prevent his discovery and apprehension, in violation of 18 U.S.C. 1381, 2.

(Signed) Guy L. Goodwin
             Guy L. Goodwin
             Assistant United States Attorney"

* Sitting by designation from the Eighth Circuit.

Also on June 6, 1966, at Wichita, Kansas, the defendant-appellant, Joyce Marie Michael, hereinafter generally identified as the appellant (accompanied and represented by William E. Glenn, Esq., theretofore appointed by the United States Commissioner as attorney for her as a defendant in the case) appeared in open court and was arraigned and pleaded not guilty to the single charge against her made in the information.

Sundry pretrial motions were filed by the defendants named in the information. Thus, both of them joined in, (a) a motion to strike the "complaint," (logically aimed at the information), because, as the defendants declared, the appellant, Joyce Marie Michael, is, and at all times material was, the wife of James Warren Michael, and, by virtue of such relationship, immune to a prosecution of the nature reflected in the information, and, as it would appear, contending that David Eugene Breeze was also protected by her relationship thus asserted, since he was charged jointly with her; and also because of the asserted violation, in their arrest, of "their rights under the laws and constitution of the United States;" and, (b) a motion to suppress "any evidence of the government procured at the time of the arrest of said defendants on or about May 6, 1966, and to suppress any evidence "procured directly or indirectly from questioning of the defendants between the time of the arrest and the time of appointment of counsel to represent the defendants," because (as the movants alleged) the arrest was made without the issuance of any complaint, summons or indictment, or any warrant of arrest, and search of the home was made without any search warrant, and because of the alleged constitutional illegality of their interrogation, after arrest and before appointment of counsel, and prior to their presentation before an appropriate Commissioner or

other officer (Rule 5, Federal Rules of Criminal Procedure). Those motions were severally denied by the District Court upon their submission.

A motion for the severance for trial, and for separate trials, of the two defendants was also made and submitted. It was, first, denied by the court. But, upon the later, and separate, motion of David Eugene Breeze for reconsideration of that ruling, duly submitted to the trial court on February 10, 1967, the requested reconsideration was had, and separate trials were accorded to the two defendants.[1]

On February 13, 1967, at Topeka, Kansas, separate trial of the appellant, Joyce Marie Michael, was had before a jury. The jury found and returned a verdict of guilty against the appellant, Joyce Marie Michael, also on February 13, 1967, which was received and entered. And on March 13, 1967, upon such verdict, the trial judge made and entered a judgment of guilty as against Joyce Marie Michael, but suspended the imposition of sentence, and placed her upon probation for the period of three years upon terms and conditions then announced, which are themselves appropriate and unexceptionable.

The present appeal followed.

█ At the outset, the court observes that the judgment thus recalled is appealable at the behest of the appellant. It is true that such judgment does not presently subject the appellant either to the payment of a fine in any amount, or to penal servitude for any interval. But, as a judgment upon the verdict which was actually found, returned and filed, it constitutes an adjudication of guilt, which, indeed, is basic to the probation and the definition of the terms thereof, (see Title 18 U.S.C. § 3651; Rule 32(c) Federal Rules of Civil Procedure.[2]) And that is not less true for

---

1. The allowance to Breeze of a separate trial naturally accorded a like separate trial to the appellant.

2. It is to be observed that the grant or recognition in Title 18 U.S.C., section

3651, supra, of the judicial authority to "suspend the imposition or execution of the sentence and place the defendant on probation," is explicitly made to arise or to exist, "*upon entering a judgment of conviction of any offense not punish-*

the reason that the imposition of sentence was conditionally deferred for a prescribed number of years, supra. During the term of the probation, Joyce Marie Michael is living, and will continue to live, under the trial court's declared probational restrictions, and, for their violation, if any, to be subject to the termination of the grace of probation, and to the pronouncement of sentence, potentially involving her imprisonment, within the definition of Title 18 U.S.C., section 1381. Moreover, her conviction, if it shall be vindicated, imposes upon her identification as one who has been convicted of a felony, with its unwelcome connotations. Finally, no challenge of the right to appeal appears to be disclosed upon the record before this court, or has been argued herein.

It is recalled that the information in the instant case was prepared and filed within the intendment of the second unnumbered paragraph of Title 18, U.S.C., section 1381. A reader of that paragraph has to understand that the significance of its otherwise unexplained words, "such person," is disclosed in the first unnumbered paragraph of that section and is "any person in the Armed Forces of the United States." [3] With that explanation, the second paragraph of section 1381 follows:

"Whoever harbors, conceals, protects or assists any such person who may have deserted from such service, knowing him to have deserted therefrom, or refuses to give up and deliver such person on the demand of any officer authorized to receive him shall be fined not more than $2,000.00 or imprisoned not more than three years or both."

While this court understands, and has hereinbefore taken notice supra, that in the Information, its author, after the already quoted language of its charge and the indentification of Title 18 U.S.C., section 1381, added thereto a comma and the figure "2", it must be recognized that such addition did not, and does not, in anywise, enlarge or alter the factual charge theretofore made in the pleading. The employed words of that accusation completely define the alleged offense at which it was aimed. Actually, Title 18 U.S.C., section 2, neither defines, not denounces, nor provides for the punishment of, any individual criminal offense. It rather prescribes, in each of its two brief sections, circumstances, or a circumstance, in the event of the existence whereof, a participant is subject to prosecution and conviction as "a principal." It does not make anything criminal which, before its enactment, was licit.

The appellant, throughout this litigation, has consistently maintained, and before this court maintains, that she is legally immune to the present prosecution because, as her counsel contends, "a wife can not be guilty of harboring her husband though she knows him to be a deserter from the armed forces."

---

*able by death or life imprisonment."* (emphasis added) And Rule 32 of Federal Rules of Criminal Procedure declares that, "the defendant may be placed on probation as provided by law," *"after conviction of an offense not punishable by death or by life imprisonment."* (Emphasis added.) Moreover, obedient to the cited statute and rule, the trial judge in the present case premised his suspension of the imposition of sentence and grant of probation with the following language: "Well, let the record show that it is the judgment of the Court, following the judgment of guilty on the verdict of the jury following trial in this case."

3. It is true that the language just quoted is followed immediately in the first paragraph of the cited section 1381 by the words, "or who has been recruited for serving therein." But, in the context of the present information and of the evidence before the court, one has to conclude that James Warren Michael is alleged, and by evidence is shown, to have been "in the armed forces of the United States," through voluntary reenlistment in the United States Navy for service therein, following some eight years of former service in that branch of the armed forces.

That the immunity for which the appellant contends finds substantial support, especially in the early decisions of the English courts, and of the states of this country, is uniformly recognized, and need not presently be fortified with the citation of reported decisions. Counsel for the appellant, both in his brief and in oral argument, cites and relies upon the declaration in that behalf of sundry familiar and respected treatises long and widely accepted. In the way of reported decisional authority, he asks for the consideration of State v. Kelly, 74 Iowa 589, 38 N.W. 503, decided on June 4, 1888. While that opinion is not really in point, it contains language supportive in principle of the present appellant's contention touching her own immunity to prosecution for her alleged harboring and concealment of her husband. Mrs. Kelly was indicted, along with her husband, for the murder of an old man in the Kelly home. The husband was tried and convicted and imprisoned. The reported opinion has to do with Mrs. Kelly's asserted guilt of the offense. She was convicted in the state's District Court of manslaughter, and appealed to the Supreme Court of Iowa, and from that court obtained the reversal of the conviction for want of evidentiary support. The Supreme Court of Iowa accepted, as a correct statement of the law with reference to the criminal responsibility of a married woman, the following language of the trial judge's charge to the jury:[4]

> " 'The law presumes that the influence of a husband over his wife is such that she is not held criminally liable for unlawful acts done by her in his presence, unless there is evidence to rebut this presumption, and satisfy the jury that the wife in what she did was exercising a free volition, and was guilty of independent criminal action on her own part; and if you find from the evidence that the defendant, Margaret Kelly, was concerned in the commission of or did the criminal act charged in the indictment to have caused the death of Charles Archibald, or aided or abetted its commission, but that what she so did was done in the presence of her husband, the law presumes, if there is no evidence to the contrary, that she was coerced by her husband to do all such criminal acts as were done by her in his presence; and she cannot be found guilty of such acts by your verdict, unless you find from the evidence that she was exercising, in what she did, a free will to do or not to do, and an independent criminal action on her own part. But if you find from the evidence that she was so exercising a free will, and an independent criminal action, the mere presence of her husband at the time she did any criminal act will not protect her from its consequences. The law does not require a wife to become an informer against her husband, or to expose his crimes or infamies; and if you do not find from the evidence, when considered under the instructions of the court, that she was concerned in the commission of the criminal acts charged in the indictment, but you do find that after they were committed the defendant did acts tending to conceal the crime of her husband, or to divert suspicion from him, such acts would not render her guilty of his criminal acts. But you may consider evidence of acts done by the defendant after the killing of Charley Archibald, and tending towards such killing, or intending to divert suspicion from the defendant or her husband, in connection with the other evidence in the case, as bearing upon her guilt or innocence of the acts charged in the indictment.' "

The immediately foregoing quotation from the instructions in State v. Kelly, supra, emphasizes its present distinguishability. (Mrs. Kelly was being prosecuted for participating in her husband's basic crime, not for harboring or sheltering him thereafter.) Nevertheless, in its reasoning and in its au-

4. The homicide there involved appears to have been committed by the husband of Mrs. Kelly, but probably, if not certainly, in her presence.

thor's reliance upon 1 Wharton, Criminal Law, section 71 et seq., and 1 Bishop Criminal Law, section 71 et seq., and 1 Bishop Criminal Law, section 358 et seq., it admittedly tends to support, at least as considered dictum, the present defendant's position respecting her duty towards her demonstratedly errant husband.

It must be observed, however, that, even thus narrowly accepted, State v. Kelly's authority in the way of persuasion is minimized by allusions to it in subsequent opinions of the court by which it was decided. Speaking as of October 19, 1920, in State v. Reynolds, 189 Iowa 1033, 179 N.W. 308, that court, in reversing and remanding the conviction of a defendant wife of manslaughter for the killing of her baby in the presence of her husband (who, himself, also charged with the offense, pleaded guilty to it and was sentenced, and who denied any participation in his crime by his wife) made the following statement:

"What we have said does not proceed on the theory that the accused is presumed, in the absence of evidence to the contrary, to have acted under the coercion of her husband. The wife was not exempted for the responsibility for murder on this ground under the common law, and the ruling in State v. Kelly, 74 Iowa 589, 38 N.W. 503, is contrary to the great weight of authority."

And in State v. Renslow, 211 Iowa 642, 230 N.W. 316, 71 A.L.R. 1111, arising in the prosecution of a woman on a charge of receiving and concealing stolen goods and property theretofore stolen by her husband, the court, in affirming her conviction, approved the refusal of the trial court to give the following instruction requested in her behalf:

"The law presumes that the influence of a husband over his wife is such that she is not held criminally liable for unlawful acts done by her in his presence, unless there is evidence to rebut this presumption and satisfy the jury that the wife in what she did was exercising a free volition, and was

guilty of independent criminal action on her own part."

And in announcing its ruling, the Supreme Court of Iowa, after taking notice of State v. Kelly, supra, said:

"In State v. Reynolds, 189 Iowa 1033, loc. cit. 1038, 179 N.W. 308, the charge was murder, and the case of State v. Kelly, supra, was overruled as being contrary to the weight of authority. The Reynolds Case holds that the wife was not exempt from the murder on this ground at common law."

That quotation is followed in the cited *Renslow* opinion by a careful study of reported cases supporting the proposition that State v. Kelly, supra, was "contrary to the weight of authority." Interestingly, on the present occasion, one case examined in that analysis from which an extended supportive quotation is made, is State v. Hendricks, 32 Kan. 559, 4 P. 1050, 1053. It is in Kansas that the instant offense is by the Information alleged to have been committed.

The foregoing discussion of State v. Kelly, supra, ordinarily, and probably even here, of intolerable length, is offered by way of respectful attention to the point for whose support it has been earnestly advanced by counsel for the appellant.

More significantly, however, the Supreme Court of the United States seems to have rejected the reasoning basic to the contention of the appellant that by virtue of her status as the wife of James Warren Michael, she was and is immune to the presecution of her which is being pursued in this case. In United States v. Dege, 364 U.S. 51, 80 S.Ct. 1589, 4 L.Ed.2d 1563, a husband and wife were charged in an indictment "with conspiring to commit an offense against the United States in violation of § 371 of Title 18 of the United States Code * * * in that they sought illicitly to bring goods into the United States with intent to defraud it." The United States District Court for the then Southern District of California dismissed the indict-

ment for failure to state an offense, in that, as that court thought, a husband and wife are legally incapable of conspiring within the reach of Title 18 U.S.C., section 371. The case was brought to the Supreme Court for direct review of the order of dismissal. Title 18, U.S.C., section 371, provides for the punishment of each person involved, "if two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose." Squarely rejecting both the theory that responsibility of husband and wife for joint participation in a criminal enterprise would make for marital disharmony, and the rule that a wife must be presumed to act under the coercive influence of her husband, the prevailing opinion of the Supreme Court in the *Dege* case declared that a husband and wife are not legally incapable of violating 18 U.S.C., section 371, by conspiring to commit an offense against the United States. It is true that three justices of the Supreme Court joined in a dissenting opinion. But, as so frequently occurs, the dissent serves effectively to disclose the consideration that the case had received in the Supreme Court, and thereby to emphasize, and not to discredit, the opinion of the majority of the court. Although what is here involved is not the conspiracy of a husband and wife to commit a crime against the United States, but rather the wife's harboring of her allegedly criminal husband, the reasoning in the *Dege* case of the majority of the Supreme Court—together, in some measure, with the manner of the expression of that reasoning—convinces this court that the Supreme Court as presently constituted would refuse to accord to the pres-

ent appellant the immunity for which she contends.[5]

It may be added briefly that the broadly comprehensive language of the second unnumbered paragraph of Title 18 U.S. C., section 1381, aimed at, "*whoever* harbors, conceals, protects or assists any such person who may have deserted from such service, knowing him to have deserted from such service" serves effectively to repel the argument that the appellant's marital status places her untouchably beyond its reach.

Accordingly, it is now held that Joyce Marie Michael's status as the wife of James Warren Michael is not itself effective dispositively to intercept her prosecution in this proceeding.

The appellant also advances the position that the entry by Raymond Radford, Agent of the Federal Bureau of Investigation, and his accompanying peace officers, (infra), into the residence of the appellant (and, upon the record, as well, of James Warren Michael, her husband) without either a warrant for arrest or a search warrant, was unreasonable and unlawful as a violation of the appellant's constitutional right under the fourth and fifth amendments of the constitution of the United States. Upon that premise, she challenges both the validity of her own arrest, and the admissibility, over timely objection, of any evidence obtained through that entry.

This court considers that the foregoing position is not well taken. It is true that on May 6, 1966, at approximately 5:30 o'clock A.M., three agents of the Federal Bureau of Investigation (under the leadership of Raymond Radford, himself one of the three), accompanied by the sheriffs of two adjacent Kansas counties and a deputy of each

---

5. This court is aware of the rulings of the Supreme Court in Hawkins v. United States, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (which dealt with a ruling by this court), and Wyatt v. United States, 362 U.S. 525, 80 S.Ct. 901, 4 L.Ed.2d 931. It has also observed the Supreme Court's own distinction (364 U.S. at p. 52, 80 S.Ct. at p. 1590) of the *Dege* case from those two cases on the score of the disparity between criminal accountability involved in the *Dege* case on the one hand, and, on the other hand, "appropriate rules for testimonial compulsion as between spouses." The problem of "testimonial compulsion" is not presently drawn into question.

such sheriff (thus, seven officers), all carrying weapons, came to the dwelling house on the small farm near Cherryvale, Kansas, that then was, and for some time theretofore had been, occupied by the appellant and her husband, James Warren Michael, as tenants, under lease from the owner of the premises. Agent Radford acted as the spokesman and the leader of all of those officers. Mr. Radford and Jack Sears, one of the sheriffs, went to the door of the house and "knocked at the front door." The appellant and David Eugene Breeze, both scantily and only partially clad, responded, and one of them slightly opened the door. The appellant inquired as to who was there. Agent Radford identified himself and his office. She asked what he wanted and Agent Radford said that he was there to arrest her husband. She responded denying her husband's presence and disclaiming knowledge of his whereabouts, and recalling to Mr. Radford like previous statements by her to him, *vide* infra. Agent Radford then said to her: "We're coming in, and we're going to arrest him and we're coming in your house." There, too, in the appellant's presence, David Eugene Breeze also said "Well, he isn't here. I don't know where he is, and I haven't seen him."

The appellant and David Eugene Breeze, or one of them, thereupon opened the door more widely, and Agent Radford and Jack Sears, one of the sheriffs, immediately entered the house and went directly to the front bedroom closet in search of James Warren Michael, and, with the aid of a flashlight borrowed from a deputy sheriff in the party of officers, located him clad only in an undergarment, lying, or otherwise located on a shelf some eight feet high in the corner of the bedroom closet. Agent Radford then took James Warren Michael into custody for his alleged desertion from the armed forces. And he also placed the appellant and David Eu-

gene Breeze under arrest for their asserted commission of the offense of which they were thereafter charged in the Information under which the appellant is being prosecuted herein, supra.

The foregoing reflection of the occurrence at the Michael residence in the early morning of May 6, 1966, is factually supported by testimony adduced upon the trial of the appellant; and it seems not to be challenged factually by evidence, or otherwise.

The basis upon which Agent Radford, and, under him, his fellow officers, acted in the encounter of the early morning of May 6, 1966, supra, is reflected largely in Radford's own testimony, which, in the current plight of this litigation, is to be accorded consideration most favorably to the appellee, inclusive of such inferences as may rationally be deduced from the evidence and testimony. See citations, infra, respecting the evaluation of evidence in the consideration of post conviction appeals in criminal cases in the federal courts.

James Warren Michael, theretofore a member of the United States Navy, reenlisted therein on February 16, 1965. Thereafter, and on July 17, 1965, an entry was made under departmental auspices in his United States Navy service record, to the effect that he had been issued orders "to report to MATS Terminal Bldg., Travis A F B F T T to Attack Squadron TWENTY TWO not later than 1800, 24 APR., 65. Failed to report in compliance with such orders and is on unauthorized absence from 1800, 24 APR., 1965." On October 11, 1965, the following entry was similarly made on his United States Navy service record: "Declared a deserter on 24 May 1965 having been on unauthorized absence since 1800, 24 APR., 1965 from Attack Squadron TWENTY TWO, on board U.S.S. Midway (CVA 41) which time absence commenced was deployed in the Western Pacific." [6] Those entries

---

6. It will be observed that this cryptic notation, entered one hundred forty days after the mentioned "declaration" was ostensibly made, does not establish or even declare by whom, or precisely by what departmental authority, such "declaration" of Michael's status as a "deserter" was so made. Interestingly too, the asserted

constituted memoranda for the information, guidance and possible further action of the naval service. They were in the nature of intra-departmental memoranda of supposedly wrongful action on the part of James Warren Michael. They were made *ex parte* and constituted an accusation, not a judicial adjudication of guilt. Nevertheless, they disclosed a position touching his status, then entertained by responsible members of the naval department.

At some not exactly identified date before January 7, 1966, the Department of Defense, in behalf of the United States Navy, had notified the Federal Bureau of Investigation, through use of a conventional form of notice, that it had declared James Warren Michael to be a deserter from the naval service, and had requested the assistance of the Bureau in the project of his apprehension. And, in turn, the Bureau had communicated information to that end to Agent Radford, then in service in the area comprising Cherryvale, Kansas. Thus alerted, Radford undertook to locate and apprehend James Warren Michael.

On January 7, 1966, Agent Radford, as he testified upon the trial of Joyce Marie Michael, approached Joyce Marie Michael at a Highway Cafe in or near Cherryvale, Kansas, where she was working, and told her that "we," i. e. the Federal Bureau of Investigation, "had received from the Department of Defense, a form supplied by the Navy through the F.B.I. in Washington, declaring her husband a deserter and asking for assistance in locating him," and asked her for information as to his whereabouts. Radford further testified that she told him then that she was aware that her husband was *absent without leave* at that time; that he had enlisted (i. e. reenlisted) some time in February, 1965, on the West Coast, and,

as Radford thought, at Portland, Oregon, but did not get the assignment he wanted, and that she and her husband together left a couple of months later and traveled to Kansas, and finally settled at Cherryvale, Kansas, south of which they operated a little roadside restaurant; but that she did not know his whereabouts or where he then was, and had last seen him on November 19, 1965, when he had left on a cattle truck with an unknown driver, and was proceeding to Detroit, Michigan in quest of employment. Radford also testified that he then asserted to Joyce Marie Michael that her husband was a deserter from the navy, and explained to her the Harboring Statute, and warned her of the hazard of her prosecution under that law; to which, as he testified, she responded that, "she would let me," i. e. Radford, "know if and when she heard from him" (i. e. her husband) "or had any information as to where he might be * * * and would cooperate with the F.B.I., and that she knew he had to return."

As a witness upon the trial of Joyce Marie Michael, Agent Radford also testified that on at least four other dates between January 7, 1966 and May 6, 1966, he had approached Joyce Marie Michael, either at the restaurant above mentioned, or at the rented Michael farm home near Cherryvale, Kansas, and asked her for information respecting her husband's whereabouts and, on most, if not all, of such calls, had reiterated his threat of prosecution of her under the harboring statute; that on each such occasion she denied that James Warren Michael was present, or that she knew anything touching his whereabouts; but that, on Radford's persisting inquiry, she admitted during one such interview that, sometime theretofore, James Warren Michael had unexpectedly returned to their home and had stayed there dur-

"declaration" of deserter's status as of 24 May 1965 antedates by fifty-four days the entry on July 17, 1965 of the foregoing notation of failure to report to Travis A.F.B. One may be allowed to wonder why the naval authorities had to

wait still another eighty-six days, until October 11, 1965, to enter upon the service record the reference to a declaration of the status of a deserter supposedly made as of May 24, 1965.

ing several days, apparently two weeks, and left on her suggestion that he should do so, but without disclosing his further destination; and again asserted that she did not know where he was; and that she also disclosed in one of those interviews that, on another occasion, James Warren Michael had come to the home, stayed very briefly, and departed without leaving information as to his further whereabouts. During one—or possibly two—of those interviews, as Agent Radford testified, David Eugene Breeze was present, and insisted in the appellant's presence that he knew nothing of James Warren Michael's whereabouts.

Agent Radford also testified that before going to the Michael residence on May 6, 1966, he had been informed from reliable sources that James Warren Michael was there, and that he was informed where he would be hiding, that is, on the shelf in the bedroom closet; and that on his entry on May 6, 1966, he "went right to the hiding place."

In the project of the early morning of May 6, 1966, the arresting officer has to be recognized as Federal Bureau of Investigation Agent Radford. He made the arrest, supra, and he was in command of the group of officers who came to the Michael home. The prime quarry in pursuit of whom he and his associates embarked on the task was James Warren Michael. Through responsible channels, Agent Radford had been notified officially that James Warren Michael had been, and then was, accused of the *felonious offense* of desertion from the United States Navy, and that the Department of Defense asserted his guilt, and enlisted the service of the Bureau of Investigation in his apprehension, and the Bureau had committed the presecution of the search for, and apprehension of, James Warren Michael to Agent Radford. Therefore, without declaring whether, objectively, James Warren Michael was then a deserter from the Navy, this court is convinced that, at the time involved, and for a considerable interval theretofore, Agent Radford was in possession of what by him was justifiably considered to be reliable information that Mr. Michael stood accused by naval authority of the serious offense of desertion, and believed that accusation to be well founded, and knew that the Naval authority was bent upon his apprehension and arrest. During about four months, Agent Radford had endeavored unsuccessfully through inquiry to locate Mr. Michael. A significant part of that inquiry, so far as Agent Radford's entry into the Michael residence is concerned, involved several interviews with the appellant, who consistently denied her possession of knowledge or information as to her husband's whereabouts, while at the same time acknowledging that, even during the period of Agent Radford's search, James Warren Michael had twice appeared unexpectedly at their home, but remained only briefly, and then departed without disclosing his next destination, supra. This court also believes from the evidence that shortly before May 6, 1966, Agent Radford had been informed by a person or persons[7] whom he reasonably believed, that Mr. Michael was actually quartered in the Michael home, and also that he spent at least some time on the shelf in the bedroom closet, supra.

■ This court is persuaded that, thus notified and informed, Agent Radford had the authority to apprehend and arrest James Warren Michael either with or without a warrant of arrest, and, for that purpose, to enter the residential premises where he had good reason to believe Mr. Michael would be found, and where he eventually was found.

By Articles of the Uniform Code of Military Justice, appearing also as Title 10 U.S.C., section 808,[8] it is provided that:

"Any civil officer having authority to apprehend offenders under the laws of

---

7. Including a girl or young woman who had been serving in the Michael home as a "baby sitter."

8. Which is one of the Military Justice Code's sections required by its Article 137 (Title 10 U.S.C., section 937) care-

the United States or of a State, Territory, Commonwealth, or possession, or the District of Columbia, may summarily apprehend a deserter from the armed forces and deliver him into the custody of those forces."

Upon the trial of the appellant, it was shown that on May 11, 1966, an entry was made upon the United States Naval service record of James Warren Michael in the following language:

"Apprehended by FBI at Cherryvale, Kansas 1840 Hours, 6 May 1966. Returned to naval jurisdiction at or about 1125 hours, 10 May 1966, U. S. Naval Air Station, Olathe, Kansas, stating on unauthorized absence from USS MIDWAY (C V A 41), San Francisco, California since at or about 1100 hours, 24 April 1965, a period of approximately 1 year, 16 days, 11 hours and 25 minutes. Retained on board pending verification of status. No claim for reward has been submitted or paid. Nav.Pers. 641 issued."

It will, therefore, be obvious that Agent Radford's apprehension and disposition of James Warren Michael were consistent with, and may be regarded as authorized by, Article 8 of the Uniform Code of Military Justice, supra.

But such apprehension was also conformable to, and within the grant of, authority declared by Title 18 U.S.C., section 3052, in the following pertinent language:

" * * * agents of the Federal Bureau of Investigation of the Department of Justice may * * * make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States, if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony."

fully to be explained to each enlisted member of the service at the time of his entrance on active duty, or within six days thereafter, and again to be explained

Touching his arrest of James Warren Michael, Agent Radford in the morning of May 6, 1966, had reasonable grounds to believe that James Warren Michael had theretofore committed the offense, of which he was accused upon his Navy service record, of desertion from the United States Navy. And with relation to the virtually concurrent arrest of Joyce Marie Michael, Agent Radford then had reason to believe that she had theretofore committed, and then was committing, the offense of harboring her husband. What has thus far been said in this paragraph is true of Agent Radford's *bona fide* subjective understanding, whether, objectively, James Warren Michael was, or was not, a deserter from the United States Navy. He then stood so accused by that branch of the Armed Services, as Agent Radford had been officially advised through customary channels; and Radford had reasonable grounds to believe the accusation to be valid. More than that was not required.

This court, therefore, considers that, quite irrespective of the ultimate determination of James Warren Michael's guilt of desertion or Joyce Marie Michael's guilt of harboring her husband, as a deserter, the arrest of each of them, and the entry by the arresting officers into their place of abode, were lawful. That is true despite the absence of a warrant of arrest in respect of either of them. And, so far as concerns the absence of a search warrant, the appellee correctly contends that there was, in the circumstances of the event, no occasion for the procurement or possession by Agent Radford of a warrant of that character. He came to arrest a man—and, contingently, also a woman, and possibly another man—not to locate, identify or seize any property. And, by the definition of Rule 41, Federal Rules of Criminal Procedure, a search warrant may be issued under the rule "to search for and seize any property (1) stolen or embezzled in violation of the laws of

after he has completed six months of active duty, and, still again, at the time when he reenlists.

the United States; or (2) designed or intended for use or which is or has been used as a means of committing a criminal offense; or (3) possessed, controlled or designed or intended for use or which is or has been used in violation of Title 18 U.S.C., § 957." [9]

In passing, it is recalled that the entry into the Michael dwelling in the morning of May 6, 1966 was accomplished without physical effort or violence. Neither Joyce Marie Michael nor David Eugene Breeze who, together, responded to the officers' knocking on the door of the house, sought to prevent such entry. In fact, as has been observed, one or the other of them enlarged the initial slight opening of the door. Yet, this court does not declare that the officers entered with their consent. For the entry was preceded by the coming to the dwelling's door of the seven armed peace officers, and by Agent Radford's blunt and categorical declaration of his determination to enter, already quoted. Thus confronted, Joyce Marie Michael had no real option. She had to yield. Protest would have been fruitless, physical resistance would have been absurd.

It may be added briefly that the conclusion already announced supportive of the legality of the arrests and of the entry into the Michael residence also prompts this court to the view that such information and evidence as ensued, or was discovered or confirmed, upon such entry was incidental to a lawful entry and arrest, and was properly received upon the trial.

The appellant contends and earnestly argues that the evidence upon her trial was insufficient to sustain her conviction, and the judgment entered upon it (recognizing, of course, the suspension of the imposition of sentence and the grant of probation.) Putting aside for later

attention herein, the vital interrelated issues of James Warren Michael's objective guilt of the accusation against him of desertion from the United States Navy, and of the appellant's actual knowledge of such guilt, this court does not believe that position on her part to be well taken.

Quotation in its entirety has already been made, supra, of the second unnumbered paragraph of Title 18 U.S.C., section 1381. It is not now repeated. Because the Information does not charge that the appellant and David Eugene Breeze herein "protected" James Warren Michael, the presence of the word, "protects," in the quoted portion of the cited section may be disregarded. It is to be noted that the Information charges that the appellant "did harbor, conceal and assist James Warren Michael, who had deserted from the Armed Forces of the United States, knowing him to have deserted therefrom," and then proceeds to define the manner of such harboring, concealment and assistance, by charging that they so acted "in that they obtained and rendered to James Warren Michael at Rural Route 3, Cherryvale, Kansas, protection, sustenance and services as might prevent his discovery and apprehension."

■ In instruction 8 of his charge to the jury, the trial judge correctly [10] informed the jurors that:

"To harbor as used in the information means to lodge and to care for after secreting the deserter; [10] to conceal as used in the information means to hide, secrete or keep out of sight; to assist as used in the information means to actively give aid and sustenance after having harbored and concealed the deserter." [10]

Because, in the already quoted applicable statute, the words "harbor," "conceal,"

---

9. Which last named purpose is patently inapplicable on this occasion.

10. Let it be understood, in connection with these three footnoted words, that the foregoing use of the expression "correctly" is not intended to signify any approval

by this court of the trial judge's unqualified and unreserved application to James Warren Michael of the epithet, "the deserter." The word, "correctly," reflects only approval of the essence of the trial judge's definitions contained in the quoted language from his charge.

and "assist," are used in the disjunctive, the proof of any one or more—not necessarily all—of the alleged acts thus identified would be required and sufficient by way of proof of the act or acts of the appellant as charged under the Information. But, in consequence of the Information's specification, supra, such proof would have to consist of the substantiation of the charge against her of the obtaining and rendering to James Warren Michael of protection, sustenance or services such as might prevent his discovery and apprehension.

■ This court considers that, appraised in its entirety and evaluated in the light most favorable to the appellee, as determined by a consideration of the evidence direct and circumstantial, together with all reasonable inferences that may be drawn from it, there was before the jury evidence adequate to support a finding that the appellant "obtained and rendered to James Warren Michael at Rural Route 3 Cherryvale, Kansas, protection, sustenance and services" (such) "as might prevent his discovery and apprehension" and thereby "did harbor, conceal" (or) "assist James Warren Michael."

■ In arriving at the conclusion last signified, this court has not overlooked its relation to the instant case. Presently under consideration is an appeal from a United States District Court within this circuit by one of two defendants heretofore found by a jury, and adjudged by the trial court, to be guilty as charged in an information in a criminal case. In such situation, it is the rule that "in determining the sufficiency of the evidence to sustain a conviction, an appellate court is confined to the question of law as to whether, viewing the evidence in the light most favorable to the prosecution, there is substantial evidence, either direct or "circumstantial, which, taken together with the reasonable inferences to be drawn therefrom, sustains the verdict." That quotation [11] fairly reflects the widely accepted position of the courts of

the federal judicial system, and by no segment thereof more explicitly declared than by this Circuit Court of Appeals. Travis v. United States (10 Cir.) 269 F. 2d 928 (Reversed on other grounds, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340); Reynolds v. United States (10 Cir.) 289 F.2d 698; Cummings v. United States (10 Cir.) 289 F.2d 904, cert. den. 368 U.S. 850, 82 S.Ct. 83, 7 L.Ed.2d 48; Van Nattan v. United States (10 Cir.) 357 F.2d 161; Williams v. United States (10 Cir.) 368 F.2d 972, cert. den. 386 U.S. 997, 87 S.Ct. 1317, 18 L.Ed.2d 345; Steiger v. United States (10 Cir.) 373 F.2d 133.

No item by item recollection or balancing of the evidence received upon the trial relevant to the appellant's harboring, concealment and assistance of her husband, through her obtaining and rendering protection, sustenance and services to and for him, such as might prevent his discovery and apprehension, will here be advanced. Nor will this court overlook the existence, in the record of the trial in the District Court, of at least some evidence suggestive that James Warren Michael's identity and presence in the Cherryvale area were not really concealed. Without any attempt at exhaustiveness, evidence is recalled that (together with his wife, Joyce Marie Michael, the appellant) James Warren Michael negotiated the lease from its owner of the residence in which he was apprehended, and the small rural acreage on which it is located, and did so expressly in behalf and in the names of both himself and the appellant, and together they paid in advance the agreed rental for the property, or a part of such rental; that the telephone in that residence was publicly listed in the names of both of the spouses; that both James Warren Michael and the appellant were together engaged, at least briefly, in the operation in the neighborhood of a roadside lunch room; that from time to time he appeared at business places in the vicinity and was observed about his rented prem-

11. From Cummings v. United States (10 Cir.) 289 F.2d 904 at page 907.

ises and elsewhere by business operators and other people.

But whatever the rental arrangement was regarding the residence and its supporting acreage, the appellant is shown by evidence actively to have participated in the procurement and maintenance of the premises. She is also shown by testimony to have had employment in probably remunerative capacities, and otherwise to have been active in the operation and management of the home in which her husband was apprehended. While the evidence is not exhaustive upon the subject, it is sufficient to support the view that she acted as a practical homemaker in the residence, and that James Warren Michael either lived there, or from time to time returned to it, as a place of habitation. And there is the testimony concerning the appellant's repeated and explicit denial both of her husband's presence at the home, and of her knowledge of his whereabouts persisted in even in the morning of his apprehension, and in the presence not alone of Agent Radford but also of his associated armed officers. In short, this court has concluded that there was evidence before the trial court from which it might reasonably have been concluded by a jury that the appellant harbored, concealed and assisted her husband by obtaining and rendering to him protection, sustenance and service that might have prevented his discovery and apprehension. That conclusion may be impaired, but is by no means nullified, through the presence in the Michael home, during an inexactly established portion of the material time, of David Eugene Breeze, a youth barely nineteen years of age, in fact at the time of the apprehension and arrest there of James Warren Michael, and of the appellant and Breeze himself.

■ There remains the question whether the appellee has proved the two related and essential allegations of the Information, (1) that from on or about March 15, 1966 until on or about May 6, 1966 James Warren Michael was a deserter from the Armed Forces of the United States, and (2) that Joyce Marie Michael, appellant herein, then knew that he was such a deserter. To support and sustain a conviction of the appellant, Joyce Marie Michael, the appellee upon the trial had the burden of proving beyond a reasonable doubt, and without reversible error, not one or either, but both of those allegations. And, obviously, of the two allegations the former was dominant. For in default of its establishment the latter also necessarily would necessarily fail of proof. One does not *know* that to be a fact which does not exist. He may *believe* it to be true; but that is not enough. And the present appellant is not under prosecution for acting on a mistaken understanding.

Two statutory definitions are first recalled.

Article 85, Uniform Code of Military Justice, Title 10 U.S.C., section 885, by way of definition of the offense of "desertion," provides in presently relevant part that:

"(a) Any member of the armed forces who—

(1) without authority goes or remains absent from his unit, organization, or place of duty with intent to remain away therefrom permanently;

is guilty of desertion.

\* \* \* \* \* \*

(c) Any person found guilty of desertion or attempt to desert shall be punished, if the offense is committed in time of war, by death or such other punishment as a court-martial may direct, but if the desertion or attempt to desert occurs at any other time, by such punishment, other than death as a court-martial may direct." [12]

---

12. The statutory allusions to the prescribed punishments upon conviction of "desertion" and of "absence without leave," are set out herein only in reflection of the contrasting degrees of seriousness with which the two offenses are respectively to be regarded. The measure of punishment is not otherwise significant herein.

By Article 86, Uniform Code of Military Justice, Title 10 U.S.C., section 886, in the way of definition of the offense of "absence without leave" it is provided that:

"Any member of the armed forces who, without authority—

(1) fails to go to his appointed place of duty at the time prescribed;

(2) goes from that place; or

(3) absents himself or remains absent from his unit, organization, or place of duty at which he is required to be at the time prescribed;

shall be punished as a court-martial may direct." [12]

It will, at once be observed that the prime distinction between the two offenses is this, that an essential ingredient of the offense of "desertion" is the possession by the offending member of the armed forces of the "intent to remain away therefrom permanently" [13]

At the outset of the evidentiary phase of the trial of the appellant, and on February 13, 1967, counsel for the appellee made the following offer in the jury's presence:

"The Government would, in lieu of its first witness, offer into evidence the Government's Exhibit No. 1 which are duly authenticated documents under the seal of the Secretary of the Navy of the United States, containing the Military record of James Warren Michael, and showing his status with the United States Navy during the period fom the 24th of April through the 6th of May, 1966."

An inceptive objection by her counsel in behalf of the Appellant, also in the presence of the jury, was aborted by the trial judge's altogether proper excuse from the court room of the jurors. In their absence, a colloquy then ensued which is copied in a footnote.[14]

An examination of the tendered Exhibit No. 1 reveals that the declaration

12. See Note 12 on Page 36.

13. That is to say, from "his unit, organization or place of duty."

14. THE COURT: Proceed, Mr. Gray.
MR. GRAY: Well, as I say, this purports to be the true copy of the service record, whereas it is an incomplete copy. It shows, for example, that—that he is declared a deserter. That is among the issues in this case the Government has to prove, and that is signed simply by a personnel officer. It fails to show what he was charged with by the Navy, that he was charged only as being absent without leave, that he was not tried or convicted in the General Court Martial, but in a Special Court Martial. I think it would be very misleading to the jury, and it is certainly unfair to present this as a service record. If they're going to put in his service record, they ought to put it all in, and I object on that ground.
THE COURT: How about it, Mr. Goodwin?
MR. GOODWIN: This is offered as a record of the defendant's husband, James Warren Michael, on the periods pertinent to this case, as I offered it originally in my offer, from the period of April 24, until—April 24, 1965 until

May the 6th, 1966. The pertinent question, the matter for the Court and jury's determination at this time is the— was the status of the defendant on May the 6th, 1966, and the period of time prior thereto. This record shows that the defendant was declared an—a deserter in 1965, was still a deserter on May the 6th, 1966. What the Navy ultimately and finally did in the way of punishment of the deserter, James Warren Michael, is not material to this charge. The only thing we are concerned with is what was his status on the morning of May the 6th, 1966. These records show that that was his status at that time, if the Court would like to examine it?
THE COURT: Pass it up. Well, this doesn't appear to be a certificate, Mr. Gray, of his entire service record. It's simply a copy of the service record, covers the period from February 16, '65 to May 27, '66. If it were a certificate covering his entire record, of course your position would probably be sound, that you are entitled to have a record of that that the certificate covers. The Court takes the view that it is not material what disposition was made of any charge that was pending at the time against James Michael. Let us assume he was acquitted of whatever charge had been brought against him. This still wouldn't

of the offer of Exhibit No. 1, although not necessarily false, was nevertheless not precisely accurate. The covering certificate of the Chief of Naval Personnel, Department of the Navy, identifies the annexed material as "true copies of pages from the service record of Airman James Warren Michael, United States Navy, 470 03 87 covering the period from 16 February 1965 to 27 May 1966." Thus, the certificate, by its descriptive reference, "of pages," abstains from any implication that the certified material is, in any sense, a complete record, even for the interval between the two designated dates, or for any other period. And it opens with his reenlistment at Portland, Oregon on February 16, 1965, and, without pretending to be complete, supra, extends to May 27, 1966, thus three weeks after the incident of May 6, 1966.

Quotation has already been made herein (and will not be repeated) of the entry of May 11, 1966 reflecting his then supposed status as "on unauthorized absence from U.S.S. Midway (CVA 41), San Francisco, California since at or about 1100 hours, 24 April 1965, a period of 1 year, 16 days, 11 hours and 25 minutes," and his temporary disposition as "Retained on Board pending verification of status." Three further entries in May, 1966 appear in Exhibit No. 1. Of them, the earliest was made on May 13, 1966 in the following language:

"May 13, 66: Transferred this date in a disciplinary status, under guard, via government air to the Commanding Officer, Administrative Command, U. S. Naval Training Center, Great Lakes, Illinois for resumption of duties and disciplinary action. To arrive NAS Glenview, Illinois ETA 173OZ 13 May 66."

The other two entries were both made at Transient Personnel Unit, Naval Administrative Command, USN TC, Great Lakes, Illinois, as of May 27, 1966. The first of them follows:

"27 May 66. Delivered on board this command at 0830, 14 May 1966 and placed in a restricted status at 0900, 14 May 1966 awaiting disciplinary action. Nav Pers 641 has not been issued."

And the second entry of that day is:

"27 May 66: Status changed at 1045, 17 May 1966 from restriction awaiting disciplinary action to confinement awaiting disciplinary action."

No such post-apprehension service record entry in Exhibit No. 1 attributes

---

be any excuse for haboring him while he was at large as one declared to be a deserter. At least that's the Court's view of the case. In other words, it's not res judicata that sometime afterward he may have been acquitted of the charges. I don't know whether he was. I don't think it is material.

MR. GRAY: He wasn't charged with that, Your Honor. He was never charged as a deserter.

THE COURT: But he was declared to be a deserter because he was A. W. O. L. for more than thirty days.

MR. GRAY: Some staff officer—But I would take the view, and I think it's correct, that the question of whether a person is a deserter hinges upon intent, and as long as he intended to return to his post, I think, is a matter of law that he is not a deserter. I believe that's a question of fact, Your Honor. But in all events, it strikes me as very prejudicial to this defendant to have a document like that go into a jury which would lead them to the view that that point is proved by the government by the mere document that you hold in your hand. I have had no opportunity at all to cross examine whoever the officer is there, that declared this man a deserter. As long as, ultimately, the Court will instruct the jury that this declaration stated there does not, in and of itself, prove the fact of desertion, I suppose I would have no valid excuse; otherwise than the fact that obviously it is prejudicial, whatever the Court's instruction is.

THE COURT: Well, of course, if we had an officer here to identify the record, and to testify that from the record this defendant had been—this James Michael had been declared a deserter, the Court fails to see that there would be much difference, and I am going to overrule the objection and receive this in evidence. I think it's the best evidence to be produced.

MR. GRAY: May I have an exception?

THE COURT: Yes.

to James Warren Michael the status of a deserter within the meaning of Article 85, Uniform Code of Military Justice, Title 10 U.S.C, section 885. But it is equally true that no such entry denies, or disclaims the possibility of, such status. However, the entry of May 11, 1966 earlier herein quoted in its reference to "unauthorized absence," coupled with an identification of the duration thereof, may be regarded as foreshadowing proceedings against him either as a deserter, or as one absent without leave. It lacks both certainty and finality. And the reality of that doubt is rationally mirrored in the resolute, and, during the trial, successful, effort of trial counsel for the appellee to intercept the disclosure to the jury of anything occurring after 5:30 o'clock A.M., May 6, 1966, and relating to the status of James Warren Michael vis-à-vis the United States Navy.

As has already been made obvious, the appellant, by her counsel, declared before the court during the trial that, by way of disciplinary action, James Warren Michael was never proceeded against on a charge of desertion, but was proceeded against on a charge of being absent without leave; that he was tried not by a general court-martial but rather by a summary court-martial, and the appellant objected to the reception in evidence of the theretofore offered, and manifestly incomplete, service record, saying, "if they're going to put in his service record, they ought to put it all in, and I object on that ground." Acquiescing in the prosecutor's response that, "this record shows that the defendant was declared a deserter in 1965" (clearly true) "and was still a deserter on May the 6th, 1966" (clearly untrue, since it shows not that he was in fact a deserter, but only that some one in the naval service made an entry so accusing him); "The only thing we are concerned with is what was his status on the morning of May the 6th, 1966," the trial court restricted the service record proof upon the issue to the record of the Naval Department as made prior to May 6, 1966. (see the

whole quoted portion of the trial record preserved in Footnote 14, supra). Thus, in effect, the court permitted the jury to observe from the naval service record of James Warren Michael that, on May 24, 1965, the entry had been made therein accusing him of being a deserter from the Navy, but denied the offer of disclosure to the jury that at a time before the trial that accusation was effectively abandoned by his subjection to, and conviction upon, the relatively minor charge of "absence without leave."

That James Warren Michael, before the trial of the appellant was so charged with and convicted of absence without leave, and that the accusation of desertion was abandoned, will not be questioned. Upon oral argument in this case before this court, counsel for the parties were asked by a member of the court what the fact in that behalf was. And counsel for the government, with laudable candor, answered that shortly after the apprehension of James Warren Michael he was proceeded against, and convicted, upon a charge of absence without leave, and was subjected to disciplinary restriction. Of course, that acknowledgment was of a fact that, through the trial, was studiously concealed from the jurors.

Incidentally, the record before this court discloses that James Warren Michael was present in court at his wife's trial, and was in uniform, and was identified in the course of the presentation of the appellee's evidence.

█ This court considers that in its context, the reception in evidence over the tendered objection, supra, of Exhibit No. 1, the narrowly selected partial service record of James Warren Michael, coupled with the rejection of the appellant's offer of proof of the action, supra, taken by the Department of the Navy after the morning of May 6, 1966, but prior to the date of trial, was erroneous. That it was serious in its character may not reasonably be doubted. Exhibit No. 1 was offered and received, and the jury was allowed to consider it, as appellee's

proof of his actual desertion. It may not rationally be supposed that it was not so regarded by the jury. Yet, it involved, at most, an intra-departmental accusation; and, by the judicial rulings made, the jury was denied the right to know that, in actual result, it had been by the Navy itself, effectively abandoned before the trial. Such a course involves a breach of faith with the statutory finders of the facts, of which the government of the United States, especially in the current delicate season, can not afford to be guilty.

■ Within the context mentioned in the immediately preceding paragraph certain items may be mentioned. Throughout the trial, counsel for the government, with obviously studied purpose, and in the jury's presence, frequently alluded not to "the defendant" or "James Warren Michael" but to "the deserter." The trial judge in his instruction No. 8, defining, "to harbor," and clearly referring to James Warren Michael, spoke of him as "*the* deserter," (emphasis added by the writer hereof). In his instruction No. 7, the trial judge, stating the essential elements of the Information, identified the alleged beneficiary of the asserted harboring as "any person who *may have* deserted from the Armed Forces of the United States" (emphasis added). That unfortunate resort to the ambiguous use of the subjunctive mood in the second unnumbered paragraph of Title 18 U.S.C., section 1381 (*vide* supra) results in a manifest misstatement of the content of the Information in this case. That Information did not charge that James Warren Michael "*may have deserted*" from the Armed Forces. It squarely charged that "James Warren Michael * * * *had deserted from the Armed Forces of the United States.*" And the proof, beyond a reasonable doubt of that actual desertion as a reality, and not as something that *may have* happened, as one essential element, is necessary to support the appellant's conviction. The appellant, by her counsel, and in her requested instruc-

tion No. 6, had expressly requested that the jury be instructed, *inter alia,* that "the burden is upon the government to establish beyond a reasonable doubt that between the dates of March 15, 1966 and May 6, 1966, James Warren Michael was a deserter from the Armed Forces of the United States." She was entitled to that categorical declaration. But, despite a handwritten notation on the written request that it was "Given in substance, elements of this case No. 7," it was simply not so given. Then, as her requested instruction No. 5, the appellant had asked that the jury be instructed that, "Desertion is a question of intent; unless James Warren Michael had abandoned any intent to return to his navy post, he can not be considered to have been a deserter." Upon that important issue, she was entitled to have an instruction, if not in those exact words, at least to that substantial effect. But the request was simply denied with the written notation, "not given." And, despite the essentiality of the alleged fact of James Warren Michael's desertion, the trial judge did not see fit to declare before the jury the imperative elements of "desertion from the Armed Forces of the United States."

What has thus far been said respecting the proof of the actual desertion from the naval service of James Warren Michael also has pertinence to the asserted knowledge by the appellant of such desertion. The reality of the desertion naturally underlies any supposed knowledge of it by the appellant. It is to be remembered that the appellant was said by a witness for the appellee to have acknowledged that she knew her husband was absent without leave. There is evidence that she knew of his absence from his station. But, unless he was in reality a deserter as that term is by law defined, supra, she could not have known that he was such a deserter. Any denial of that proposition would take high rank among the absurdities.

This court is of the opinion that, appraised in the light of the foregoing features of the trial of Joyce Marie Mi-

chael, the reception in evidence over timely objection of appellee's Exhibit No. 1, restricted to occurrences before 5:30 o'clock A.M. of May 6, 1966, coupled with the resistance to, and rejection of, the appellant's demand for the presentation of the entire record upon the issue of desertion, was error of such serious character as to require that the judgment herein as against Joyce Marie Michael be reversed, and the case be remanded to the District Court for the District of Kansas, for a new trial, and announces its ruling accordingly. And that is true although it be considered that some of those features have not, singly and individually, been made the subjects of exceptions adequate to require reversal on their account alone. They do not stand alone.

█ A final observation is offered. This court freely recognizes that in a case of this character brought under Title 18 U.S.C., section 1381, unnumbered second paragraph, it is not essential to the conviction of an alleged harborer that the asserted deserter be actually charged with, or convicted of, desertion by the military after his apprehension. Beauchamp v. United States (6 Cir.) 154 F.2d 413 appears correctly so to determine. In passing, it is noted here that Mancuso v. United States (6 Cir.) 162 F.2d 772, 773, on account both of the untimeliness of its proceedings in review, and of the inadequacy to support a conviction for desertion on a plea of not guilty, of that sailor's service record is not presently in point. But the instant case does not involve proof of the essential element of the service man's actual desertion by evidence wholly apart from his service record. Here the appellee resorted chiefly to the service record for such proof, and, by concealing from the jury the determinative phase of the accusation against the service man, led the jury to suppose that there was finality in the accusatory memoranda in the service record which the jurors were allowed to see, supra. Such a course is unacceptable.

Reversed and remanded for new trial.