Robert E. **MARTIN, III, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Supreme Court of Kentucky.

Nov. 20, 1979.

Jack Emory Farley, Public Advocate, Erwin W. Lewis, Asst. Public Advocate, Frankfort, for appellant.

Robert F. Stephens, Atty. Gen., John F. Zink, Asst. Atty. Gen., Frankfort, for appellee.

LUKOWSKY, Justice.

Martin was convicted of murder and first degree burglary. He was sentenced to consecutive terms of imprisonment of thirty and twenty years. He appeals. We reverse and remand for a new trial.

On December 26, 1977, a 93 year-old-woman was found dead in her home by police summoned by worried friends. She was found on her bed. Her hands and feet were tied. Bed clothing, a throw rug, and newspapers were tied around her head by a bedsheet. The home had been ransacked. Her death was caused by asphyxiation. The autopsy also established the time of death at approximately midnight on Christmas Eve. The woman was last seen alive "before it got too dark" on Christmas Eve. Members of the Madisonville Police Department immediately began their investigation.

On the morning of the 27th one of the investigators received a call from an anonymous informant who told the officer to check out Martin because "he was in town and he was AWOL, and that he had been trying to borrow money from people" and because he knew the deceased, her habits, and her house. The police had not previously obtained information from this informant, nor did they endeavor to verify through U.S. Army channels that Martin was indeed absent without leave from his duty station or that he was listed as a deserter from the army. Nevertheless, the officers began the hunt for Martin immediately.

The chase led them to the apartment of a friend of Martin, but he was not there at the time. The officers returned the morning of the 28th with the express intention of taking Martin into custody:

Q. But you stated earlier in the conversation in the testimony with me, with my questioning, that you fully intended to arrest Robert Martin at that time, didn't you?

A. I fully intended to take him into custody and find out if he was AWOL.

Q. You intended to find out if he was AWOL by taking him into custody?

A. Yes sir. I intended to find out if he was AWOL.

The officers were admitted to the home and proceeded upstairs where Martin was found hiding under a bed. They directed him to come out. According to the officers, Martin asked, " 'Is all you want me for is AWOL?' " while he was getting up, to which the officer replied "Yes" and then read to Martin his *"Miranda"* rights. Martin was handcuffed and taken to the police station. At the station and at the request of the police, Martin called back to his friend's house and had his leave papers brought to him. The police examined the leave authorization which reflected that Martin's leave expired on November 10.

The police began to question Martin concerning his whereabouts on the 24th and 25th, and he agreed to take a polygraph test the following morning. This period of interrogation lasted approximately 35 minutes. The evidence indicates that the military authorities were not notified promptly that Martin was being held for being AWOL. One of the officers testified the military was notified on the 28th. However, the jailer testified that while it was routine to notify the military when a person was held for them, one of the policemen said, "He may be a suspect in a murder case." When the jailer asked if he should call the military, the officer tacitly declined the offer. Consequently, the jailer made no call. Also, a military representative with the responsibility for apprehending AWOL service members in the Madisonville area stated his normal procedure was to begin his investigation of an AWOL immediately upon receipt of notice of apprehension. His records disclosed that his investigation of Martin's case did not begin until the 29th.

On the morning of the 29th, nearly 24 hours after Martin was arrested, he took a polygraph test. At some time before this

examination, a witness had come forward and told the police Martin had said that he had been involved in a caper in which a killing had taken place. After the polygraph the interrogation resumed. Martin was confronted with the name of the witness, and he then made an extensive statement acknowledging he was involved in the burglary and murder. Martin was then "arrested" for the murder and taken before a magistrate, some 28 hours after he was taken into custody.

The cavalier attitude of local law enforcement personnel to limitations on their power is exemplified by the following exchange at the hearing on the suppression of the confession:

Q: Larry, did you make any effort to contact the military authorities?

A: Yes.

Q: When did you do that?

A: When he was in custody.

Q: I noticed several times that you talked about detention and custody and arrest. Have you and other officers, to your knowledge, detained people prior to making an arrest?

A: Sure.

Q: Have you done that in the past, taken people into custody before an actual arrest?

A: Sure.

The crucial issue in this case is whether the use of the confession given by Martin must be denied the Commonwealth as the fruit of a poisonous tree. Federal law requires us to hold that Martin's arrest was illegal, that the confession was a product of that arrest and that the confession should have been suppressed.

*Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) and *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) clearly establish that the admissibility of a confession does not turn solely upon the Fifth Amendment concept of voluntariness. Proper *"Miranda"* warnings and voluntariness are merely · the " 'threshold requirement' for Fourth Amendment analysis, . . ." *Dunaway*

*v. New York,* 442 U.S. at 217, 99 S.Ct. at 2259, 60 L.Ed.2d at 839. Therefore, we must first determine if there was indeed an illegal arrest.

 The police officers candidly admitted that they set out to take Martin into custody "to see if he was AWOL," and that this was within their authority. On this point, however, they were mistaken. Aside from the fact that the anonymous tip did not give the officers probable cause to believe that Martin was AWOL, they did not have authority to arrest him for that military offense.

At common law civil officers could not arrest upon probable cause for offenses punishable only by court-martial. *Kurtz v. Moffitt,* 115 U.S. 487, 6 S.Ct. 148, 29 L.Ed. 458 (1885); 5 Am.Jur.2d Arrest sec. 25. Congress first granted civil officers authority to arrest deserters from the armed forces in 1890. That grant is now found at 10 U.S.C. sec. 808:

"Apprehension of Deserters—Any civil officer having authority to apprehend offenders under the laws of the United States or of a State, Territory, Commonwealth, or Possession, or the District of Columbia may summarily apprehend a *deserter* from the armed forces and deliver him into the custody of those forces." (emphasis added)

The military offense of unauthorized absence or absence without leave, 10 U.S.C. sec. 886, is an offense distinct from but included in the offense of desertion. 10 U.S.C. sec. 885. AWOL is a general intent crime, requiring only a showing that the military member was absent from his duty station and that his absence was without authority. *See* E. Byrne, Military Law 122 (2d ed. 1976). Desertion on the other hand requires that an additional element be proved, i. e., that the member had formed the specific intent not to return. *Michael v. United States,* 10th Cir., 393 F.2d 22, 36–37 (1968); Annot. 4 A.L.R. Fed. 746 sec. 2. In civil terms AWOL is the misdemeanor. included in the felony of desertion. *See United States v. Barber,* D.Del., 300 F.Supp. 771

(1969). The clear distinction between these two offenses is not of recent definition. Winthrop, in his treatise on military law, acknowledged the difference 95 years ago. *See* W. Winthrop, Military Law and Precedents 637–45 (2d ed., 1920 reprint). The debate in the Congress surrounding this grant of authority to civil officers did not include a discussion of unauthorized absence, but rather only the offense of desertion. 21 Cong.Rec. 3083 and 5771.

■ The opinion in *Myers v. United States,* 10th Cir., 415 F.2d 318 (1969), on which the trial court relied in holding that 10 U.S.C. sec. 808 grants civil officers the power to arrest AWOL military members, overlooks the distinction between desertion and AWOL. There the court merely states without foundation that section 808 bestows that power. *Myers* blindly followed a prior case from the same court which interpreted section 808 to permit civil officers "to apprehend *straying* members of the Armed Forces and ·to detain them for delivery into the custody" of the military. *Sablowski v. United States,* 10th Cir., 403 F.2d 347 (1968) (emphasis added). These opinions paint with too broad a brush. Congress simply did not mention AWOL personnel in section 808 and nothing establishes any congressional intent to include them by implication. Unlike the court in *State v. Somfleth,* Or. App., 492 P.2d 808 (1972) we decline the opportunity to follow the Tenth Circuit in hearing unuttered words from the mouth of Congress. We hold that civil officers have no authority to arrest members of the armed forces who are merely unauthorized absentees.[1]

■ Having concluded that the Madisonville Police had no authority to arrest Martin for being AWOL, it is now necessary.to determine if the officers had probable cause to "summarily apprehend" him for desertion. "Apprehension is the taking of a person into custody." 10 U.S.C. sec. 807(a). The terms "apprehension" and "custodial arrest" or "arrest" are synonymous in military practice. *United States v. Kinane,* C.M.A., 1 M.J. 309 (1976). "No person may be ordered into arrest or confinement except for probable cause." 10 U.S.C. sec. 809(d). Therefore, probable cause is a prerequisite for a valid apprehension. *United States v. Edge,* N.C.M.R., 1 M.J. 924 (1976). Where the civil officers have probable cause to believe that a person is a deserter, they may even enter premises where they have reasonable cause to believe the deserter may be found and effect the arrest. *United States v. James,* 9th Cir., 464 F.2d 1228 (1972); *United States v. Grass,* 6th Cir., 443 F.2d 28 (1971).

■ Here the police only had an anonymous call that Martin was AWOL and began the hunt. Probable cause can be founded upon information gained through a *reliable* informant, coupled with some type of verification of the information. *Roberts v. Commonwealth,* Ky., 572 S.W.2d 598 (1978); *Roberson v. Commonwealth,* Ky., 490 S.W.2d 733 (1973). But an arrest based on nothing more than a tip from an unidentified informer lacks probable cause and is invalid. *Iles v. Commonwealth,* Ky., 476 S.W.2d 170 (1972). The same rule is applied to "apprehension" under military law. *United States v. Edge, supra.*

■ Martin's spontaneous statement that he was AWOL did not give rise to probable cause that he was a deserter. The leave documents that Martin had brought to him at the police station showing that his leave had expired more than 30 days before cannot validate the arrest. Probable cause must exist *before* any arrest. It is true that peace officers can make a forcible,

---

1. As a practical matter, our holding does not hinder the Commonwealth's officers in their efforts to apprehend military deserters. Administratively, the armed forces designate a member AWOL for a period of 30 days as a deserter and then notify the civil authorities that the service member is wanted for desertion.

Upon receipt of the military notice, or where there are other reasonable grounds to believe the service member is a deserter, then probable cause exists to arrest an individual for desertion under 10 U.S.C. sec. 808.

brief investigatory stop even where probable cause for arrest is lacking if they can demonstrate articulable suspicion of criminal activity. *Deberry v. Commonwealth,* Ky., 500 S.W.2d 64 (1973); *Bays v. Commonwealth,* Ky., 486 S.W.2d 706 (1972); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). But the intrusion and the resulting incidents of an investigatory stop are severely limited, unlike those of a full custody arrest. Martin was handcuffed and taken to the police station. In no way can this be termed an investigatory stop. Because any probable cause to arrest Martin for desertion arose only after he was taken into custody, the arrest was invalid.

■ Having determined that the arrest of Martin was invalid, we must evaluate whether there is such a "close causal connection between the illegal seizure and the confession" as to require the exclusion of the statement at trial. *Dunaway v. New York,* 442 U.S. at 217, 99 S.Ct. 2259, 60 L.Ed.2d at 839. The factors to be considered in determining whether the confession is obtained by exploitation of the illegal arrest are "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct . . . And the burden of showing admissibility rests, of course, on the prosecution." *Brown v. Illinois,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62, 45 L.Ed.2d at 427.

■ The confession does not have to follow the illegal arrest closely in time in order to be causally connected. Indeed, the concurring opinion in *Dunaway* points out that where there are "no relevant interven-

ing circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one." *Dunaway v. New York,* 442 U.S. at 220, 99 S.Ct. at 2260, 60 L.Ed.2d at 841 (Stevens, J., concurring).[2] Martin was interrogated immediately at the police station about the murder. The police told him that they were investigating a capital offense. Martin agreed to take a polygraph test the next day but was still detained in custody. He stated that he was unable to sleep while in jail. A clinical psychologist testified that Martin was unable to resist suggestion and responded compulsively when questioned by someone in a position of authority.

There was no intervening circumstance which occurred to insulate the decision to give a statement from the illegal arrest. Martin was not taken before a magistrate for 28 hours after arrest. Martin's confinement was continuous.[3]

Finally, the arrest of Martin had that "quality of purposefulness" which is the target of the exclusionary rule. When he was first brought to the jail on the "AWOL" charge, a policeman told the jailer Martin "may be" a murder suspect. The investigating officer also admitted that at the time Martin made his statement, "we didn't have any other suspects." As in *Brown v. Illinois,* "the arrest both in design and in execution, was investigatory." The earmarks are that the police "embarked upon this expedition for evidence in the hope that something might turn up." *Brown v. Illinois,* 422 U.S. at 605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428.

2. *See Hale v. Henderson,* 6th Cir., 485 F.2d 266 (1973) where a confession made 42 hours after an invalid arrest, after Hale had talked privately with his wife and had been confronted with the witness, was found to be tainted by the illegal arrest.

3. In *Wong Sun v. United States,* 371 U.S. 471, 9 L.Ed.2d 441, 83 S.Ct. 407 (1963), Wong Sun was released on his own recognizance and returned voluntarily several days later to make the statement. Therefore, the connection between the unlawful arrest and the statement

had become so attenuated as to dissipate the taint.

In *Allen v. Cupp,* 9th Cir., 426 F.2d 756 (1970), the court assumed that holding Allen on a traffic charge while he was a burglary suspect was an illegal detention. But, because he was later arrested for burglary on a valid warrant from a sister county, then transferred to the jail of that county where he was confronted with his accomplice who had given a statement and only then confessed the court concluded the confession was not the product of the illegal detention.

On the case as a whole we are unable to say that the prosecution has met its burden of showing admissibility. The social utility of the exclusionary rule as a device to control overzealous police misconduct has been a subject of scholarly debate for more than three generations. The most famous critic of the rule was Justice Cardozo who pointed out the worst possible effect of the rule when he wrote "The criminal is to go free because the constable has blundered." *People v. Defore*, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926). However, the existence and application of the rule are not open questions. The Supreme Court of the United States has imposed the rule upon the states through its interpretation of the Fourth and Fourteenth Amendments to the U.S. Constitution. Article VI of that document makes its decision "the supreme law of the land" and binds "the judges of every state" to apply it. Consequently, we are compelled to direct suppression of the confession as fruit of the poisonous tree no matter how unpalatable that action may seem.

Our disposition of this case makes it unnecessary to discuss Martin's other assignments of error, with the exception of the request for a bill of particulars, which we consider to be without merit.

The judgment of the Hopkins Circuit Court is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

All concur except CLAYTON, STEPHENSON and STERNBERG, JJ., who dissent.

CLAYTON, Justice, dissenting.

While recognizing the commendable legal analysis of the majority opinion, I dissent from the court's decision because I believe that the majority's literal interpretation of 10 U.S.C. § 808 is far too technical and basically incompatible with the spirit of law enforcement cooperation between military and civilian authorities that is intended by the statute. I would instead follow the lead taken by the Tenth Circuit Court of Appeals in *Myers v. United States*, 10th Cir., 415 F.2d 318 (1969) and *Sablowski v. United States*, 10th Cir., 403 F.2d 347 (1968) and that court's more liberal construction of the law.

The *Myers* court, at 319, stated: "[I]t was neither unreasonable nor unlawful for the . . . State Police officer, when he observed two young men in military fatigues riding in a car . . . to investigate and inquire whether they had the proper leave orders. When they were unable to produce them and when they volunteered the information that they were AWOL, the officer had the authority and the duty to arrest them."

The circumstances here are similar. The police officer, in the process of determining if an individual was AWOL, was confronted with the appellant's tacit admission that he was in fact absent without leave. The officer then placed the appellant under arrest for violating the law. The fact that the law being violated originated in the Uniform Code of Military Justice rather than in the Kentucky Penal Code seems inconsequential under the circumstances. To hold civilian authorities responsible for knowing and understanding the finer distinctions of military laws and codes would be burdensome to their basic function as law enforcement agents. Would not most of us consider the arresting officer patently derelict in his duties had he not taken the appellant into custody once becoming cognizant of his AWOL status?

Accordingly, I would find that appellant's arrest was valid. Consequently, his subsequent confession to the murder of Sallie Bronaugh while in lawful custody was not a fruit of the poisonous tree and properly admissible at trial.

STEPHENSON and STERNBERG, JJ., join in this dissent.