Judge BAKER
delivered the judgment of the Court:
Appellant was tried by a military judge sitting as a general court-martial. Contrary to his pleas, he was convicted of fraudulent enlistment, five specifications of larceny, forgery, and sixteen specifications of the unauthorized use of another’s credit card in violation of Articles 83,121,123, and 134, Uniform Code of Military Justice (UCMJ), 10 USC §§ 883, 921, 923, and 934, respectively. The adjudged and approved sentence provided for a bad-conduct discharge, confinement for five years, a fine of $2,500, forfeiture of all pay and allowances, and reduction to pay grade E-l. The Court of Criminal Appeals affirmed the findings and sentence. 54 MJ 742 (2001). We granted review of the following issues:
I
WHETHER THE MILITARY JUDGE ERRONEOUSLY DENIED APPELLANT’S MOTION TO SUPPRESS EVIDENCE OBTAINED FROM AN UNLAWFUL ENTRY IN A THIRD PARTY’S HOME BY MILITARY LAW ENFORCEMENT AGENTS WHO, BELIEVING HE WAS INSIDE, ENTERED THE RESIDENCE WITHOUT A SEARCH WARRANT IN VIOLATION OF THE FOURTH AMENDMENT.
II
WHETHER THE APPREHENSION OF APPELLANT BY MILITARY LAW ENFORCEMENT AGENTS, AFTER THEIR ENTRY INTO A PRIVATE THIRD PARTY RESIDENCE, WAS IN VIOLATION OF RCM 302(e)(2) AND HIS CONSTITUTIONAL PROCEDURAL DUE PROCESS RIGHTS.
III
WHETHER THE LOWER COURT ERRONEOUSLY CONCLUDED THAT *284 THE INORDINATE AND UNEXPLAINED POST-TRIAL DELAY CAUSED BY THE MILITARY JUDGE DID NOT PREJUDICE APPELLANT.
We conclude that the entry into a civilian third party’s residence violated the Fourth Amendment, U.S. Const, amend. IV.[1] Nonetheless, for the reasons set forth below, we hold that the evidence obtained subsequent to this illegality was not subject to suppression at trial. However, regarding Issue III, we find it necessary to order a remand to the Court of Criminal Appeals for that court’s analysis of appellant’s claim in light of this Court’s decision in United States v. Tardif, 57 MJ 219 (2002).

Background

On December 18,1996, the Naval Criminal Investigative Service (NCIS) initiated an investigation into several checks fraudulently passed through the Atlantic Fleet Credit Union. Appellant soon became the focus of this investigation. When Special Agent (SA) Edward M. Coyle, the lead investigator on the case, contacted appellant’s command, he learned that appellant had been an unauthorized absentee since December 12, 1996. On January 6,1997, appellant’s commanding officer issued a Department of Defense (DD) Form 553 (Deserter/Absentee Wanted by the Armed Forces). On February 5, 1997, an informant advised SA Coyle that appellant was staying at the private off-base residence of Hospital Corpsman Second Class (HM2) Tom Guest. The informant also indicated that appellant might be leaving the residence around 2:00 p.m. for an appointment. Other individuals contacted during the investigation informed SA Coyle that appellant often carried around a black knapsack thought to contain stolen or fraudulent credit cards and credit card receipts. Further, two young women interviewed by NCIS indicated that they had seen appellant in possession of credit card receipts that were not in his name. Based on this information, SA Coyle and three other NCIS agents went to HM2 Guest’s residence to set up surveillance and await appellant’s departure for his appointment. Although SA Coyle had a copy of the DD Form 553 in his possession, he did not have either a search warrant or an arrest warrant issued by a civilian magistrate. Because SA Coyle was not sure whether the knapsack was in the residence and because he knew the residence belonged to HM2 Guest, he believed that he needed a search warrant to search the residence. Since he did not have a search warrant, he made the decision to wait and attempt to apprehend appellant outside the residence.
At approximately 1:15 p.m., the NCIS agents saw two men leave the home, one of whom they thought fit appellant’s description. They stopped the two men and discovered they were in fact HM2 Guest and a friend, Bobby Salazar. SA Coyle then informed HM2 Guest that he had a warrant for appellant’s arrest. HM2 Guest replied that appellant was still inside the residence. When asked whether NCIS agents could enter his residence to apprehend appellant, HM2 Guest replied, “I would prefer if [you] would wait and allow me to bring him out.” SA Coyle followed HM2 Guest, stopping at the entrance to the front door while HM2 Guest entered.
The front door of the house opened into a foyer with an entrance on the left that led to a living room where appellant had been staying for two or three days, sleeping on a sofa. According to HM2 Guest, who was standing in the foyer, appellant was in the living room on the sofa when he entered the residence. However, neither the living room nor the sofa were visible from the front door. HM2 Guest called to appellant from the foyer and told him that there were people at the door to see him.
SA Coyle and HM2 Guest testified slightly differently about what transpired next. According to SA Coyle, when appellant stepped out of the living room to see who was at the door, he first asked appellant for his name. When appellant responded, SA Coyle informed him that he was under apprehension and entered the residence to take him into custody. As noted earlier, SA Coyle realized he needed a search warrant before entering *285 HM2 Guest’s residence to search for appellant, which is why he and the other NCIS agents initially waited outside. However, when appellant appeared after being beckoned by HM2 Guest, SA Coyle reasoned that because appellant was “in my sight, in plain view,” he was authorized to enter the residence. He also indicated that his concern for “officer safety” prompted his entrance because he did not know if there were other people or weapons in the room from where appellant had just emerged. In SA Coyle’s view, the DD Form 553 authorized his entry to apprehend appellant. SA Coyle testified that appellant was approximately three feet inside the house when he told appellant he was under apprehension.
According to HM2 Guest, he entered his residence, stopped at the entrance to the living room, and called appellant. He stated that SA Coyle came past him as soon as appellant tried to look to see who was at the door. According to HM2 Guest, at this point SA Coyle entered the house, went to the entrance to the living room and told appellant, “ ‘[Djon’t move. I’ve got you,’ or something to that effect.” The military judge resolved this factual issue by finding that “[SA] Coyle, upon seeing [appellant] peek around the corner into the foyer, went inside the residence and placed [appellant] under military apprehension in the foyer.”
Appellant was immediately given his Article 31, UCMJ, 10 USC § 831, rights upon apprehension and was guided back into the living room to the sofa. However, he was not questioned beyond being asked his name and, whether a knapsack adjacent to the couch belonged to him.[2] SA Coyle then asked appellant to sign a one-page consent form authorizing the search of his knapsack. According to SA Coyle, he apprehended appellant at 1:25 p.m. and appellant signed the form at some time between 1:25 p.m. and 1:45 p.m. The permissive search authorization form indicated appellant’s consent to the search of his “personal bags, knapsack(s) and other luggage.” It further stated that he was advised of, and understood, his “constitutional right to refuse to permit this search in the absence of a search warrant.” Only after appellant’s consent was given did SA Coyle seize the knapsack.
HM2 Guest subsequently consented to a search of his home for appellant’s additional belongings. During this search, appellant’s duffel bag was seized from a second floor room. The NCIS agents checked the bags for weapons and loaded them in their car for transport back to the NCIS field office in Norfolk, Virginia.[3]
The NCIS agents then took appellant and his bags to the field office. There, appellant acknowledged his Article 31 rights again and executed a written waiver of those rights. However, the agents did not seek additional consent to search his bags, at the field office. Special Agents Coyle and James Campbell then searched appellant’s bags and questioned him about individual items as they discovered them. These items included credit card receipts and credit card numbers. The NCIS agents asked appellant if he had used the credit card numbers or signed the receipts. Appellant confessed that he had obtained the credit card numbers from a Mr. Ratsamy Phanivong, that he knew that they did not belong to Mr. Phanivong, that he did not have permission to use the credit card numbers, and that he used them fraudulently.
At trial, defense counsel made a timely objection to the admission of the contents of the bags and to the confession. The thrust of his argument was that the entry into HM2 Guest’s residence violated R.C.M. 302, Manual for Courts-Martial, United States (2000 ed.),[4] and the Fourth Amendment. Therefore, he asserted, the evidence from the bags and the confession, derived from the illegal entry, were inadmissible. The military judge found the DD Form 553 to be the “functional *286 equivalent of an arrest warrant,” that appellant was not a “resident” of HM2 Guest’s residence, and that appellant’s consent was valid.
In this Court, appellant contends that he had a reasonable expectation of privacy in HM2 Guest’s residence because he .was an overnight guest and, therefore, has standing to challenge the search. He claims that the warrantless entry by the NCIS agents into HM2 Guest’s residence violated the Fourth Amendment, and therefore, that the evidence and confession must be suppressed as fruits of the illegal entry.
The Government first argues that SA Coyle’s apprehension of appellant satisfies the Fourth Amendment because a DD Form 553 is the equivalent of a civilian arrest warrant. In the alternative, the Government argues both that HM2 Guest consented to SA Coyle’s entry into the residence, and that exigent circumstances independently justified the entry.[5]
For the reasons set forth in Part I of the discussion below, we reject the military judge’s conclusion, and that of the court below, that the entry was lawful. However, in Part II, under the rationale of Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), we further conclude that appellant’s subsequent consent to the search of his bags was not the exploited product of the prior illegal entry and thus, was sufficiently attenuated from that illegality. Therefore, under the principles enunciated in New York v. Harris, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), the confession obtained at the field office was also sufficiently attenuated from the prior illegality and properly admitted at trial.
I
A military judge’s denial of a motion to suppress is reviewed for an abuse of discretion. United States v. Monroe, 52 MJ 326, 330 (2000). A military judge’s fact-finding is reviewed under a clearly erroneous standard, and his conclusions of law are reviewed de novo. Id.
Granted Issue I requires us to consider the entry by military law enforcement officials into a civilian residence, without a civilian warrant, to apprehend a military member whom military officials have designated an unauthorized absentee or deserter.
The Fourth Amendment provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.
U.S. Const, amend. IV.
The history of the protections secured by this amendment is both long and familiar. At its core stands “the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.” Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961) (citations omitted). The principles of the Fourth Amendment “apply to all invasions on the part of the government and its employees of the sanctity of a man’s home and the privacies of life.” Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886). Indeed, “physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed....” United States v. United States District Court for the Eastern District of Michigan, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). “The right of officers to thrust themselves into a home is ... a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance.” Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). ‘Were federal officers free to search without a warrant merely upon probable cause to believe that certain articles were within a home, the provisions to the Fourth *287 Amendment would become empty phrases, and the protection it affords largely nullified.” Jones v. United States, 357 U.S. 493, 498, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). See Kirk v. Louisiana, 536 U.S. 635, 122 S.Ct. 2458, 2459, 153 L.Ed.2d 599 (2002)(per curiam)(“[B]ecause ‘the Fourth Amendment has drawn a firm line at the entrance to the house ... [, a]bsent exigent circumstances, that threshold may not reasonably be crossed without a warrant”’)(quoting Payton, 445 U.S. at 590, 100 S.Ct. 1371).
Application of the Fourth Amendment to these facts requires a review of several Supreme Court cases dealing with seizures within the home and the warrant requirement: Wong Sun, Brown, Payton, and Minnesota v. Olson, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).
A.

Standing

The first question is whether appellant has standing to challenge his arrest in the residence of HM2 Guest, a third party. The Government conceded at oral argument that appellant has standing as a resident of HM2 Guest’s house to press his Fourth Amendment claim that the entry into the residence was unlawful. Notwithstanding this concession, we conclude independently that appellant has such standing.
Mil.R.Evid. 311, Manual, swpra, states:
(a) General rule. Evidence obtained as a result of an unlawful search or seizure made by a person acting in a governmental capacity is inadmissible against the accused if: ...
(2) [T]he accused had a reasonable expectation of privacy in the person, place or property searched; the accused had a legitimate interest in the property or evidence seized when challenging a seizure; or the accused would otherwise have grounds to object to the search or seizure under the Constitution of the United States as applied to members of the armed forces.
An arrest[6] is a seizure of the body covered by the Fourth Amendment, and warrantless seizures inside a home are presumptively unreasonable, absent exigent circumstances. Payton, 445 U.S. at 585-86, 100 S.Ct. 1371. However, the arrest of a person inside his own home made with a valid arrest warrant does not violate the Fourth Amendment, and does not require a search warrant. Id. at 602-03,100 S.Ct. 1371. In Payton, the Supreme Court explained that an arrest warrant is sufficient to protect a citizen’s privacy interest in his own home when he is arrested there.
It is true that an arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to interpose the magistrate’s determination of probable cause between the zealous officer and the citizen____ Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.

Id.

Noting the distinct interests at issue between an arrest warrant and a search warrant, the Court stated:
An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast, is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and there *288 fore safeguards an individual’s interest in the privacy of his home and possessions against the unjustified intrusion of the police.
Steagald v. United States, 451 U.S. 204, 213, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).
In Olson, the Supreme Court extended the Fourth Amendment’s protections to overnight guests. The Court concluded that “Olson’s status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable.” Olson, 495 U.S. at 96-97, 110 S.Ct. 1684. Defendant Olson was implicated in a robbery and feared being arrested if he returned home. State v. Olson, 436 N.W.2d 92, 96 (Minn.1989). Instead, that night he stayed at an acquaintance’s home. Id. The following day, police were informed of Olson’s whereabouts and proceeded to that location. Olson, 495 U.S. at 93,110 S.Ct. 1684. With guns drawn, they entered into the acquaintance’s home without either permission or a warrant. Id. at 94, 110 S.Ct. 1684. The Court held that Olson’s subsequent arrest was unlawful. Id. at 100-01,110 S.Ct. 1684.
Similarly, appellant had been staying with HM2 Guest for two or three days, sleeping on a sofa. Like Olson, appellant was an overnight guest with a sufficient interest in HM2 Guest’s home and therefore, was protected from a warrantless arrest in the home under the Fourth Amendment as interpreted by Olson. Accordingly, appellant has standing to challenge the lack of an arrest warrant.[7] Id. at 98-99,110 S.Ct. 1684.
B.

Legality of the Apprehension

As noted earlier, the Government contends that the DD Form 553, combined with the authority in Article 8, UCMJ, 10 USC § 808, is the equivalent of a civilian arrest warrant. This form differs, however, from a civilian arrest warrant in several respects. First, it is issued by a military commander and gives authority to apprehend based on Article 8, UCMJ. The DD Form 553 in this case indicated on its face that the person named was a “Deserter/Absentee Wanted by the Armed Forces.” On the fill-in-the-blank form, appellant’s commanding officer[8] certified that appellant had been absent for 10 days, and that he had investigated appellant’s absence. No authorization beyond the commander’s signature was noted on the form. The reverse side of the DD Form 553 noted that the form itself, combined with an oral notification from military or federal officials “that the person has been declared a deserter and that his/her return to military control is desired,” gives a civil officer authority to apprehend. However, the DD Form 553 is applicable only to the military offense of desertion.
A federal arrest warrant, by contrast, is issued by a federal magistrate judge, derives its authority from the Federal Rules of Criminal Procedure and can be issued for any federal offense. A federal arrest warrant may be issued after a finding of probable cause by a magistrate judge based upon a written complaint made under oath. Fed. R.Crim.P. 3 & 4. If the magistrate judge finds “probable cause to believe that an offense has been committed and that the person named in the complaint has committed it, a warrant for the arrest of that person shall issue to any officer authorized by law to execute it.” Fed.R.Crim.P. 4(a). The warrant must be signed by the magistrate judge and contain the name or description of the person. Fed.R.Crim.P. 4(c)(1). Most significantly, however, a federal warrant may be executed “at any place within the jurisdiction of the United States.” Fed.R.Crim.P. 4(d)(2)(emphasis added).
We agree that, on a superficial level, a DD Form 553 resembles an arrest warrant issued by a federal magistrate judge. Howev *289 er, in our view that is where the similarities end. Because the source of authority of the two issuing officials is different, so too is the legal effect of the two documents when the issue is entry into a civilian home.
The Supreme Court permits a non-lawyer to act as a magistrate judge as long as he is “neutral and detached,” and “capable of determining whether probable cause exists for the requested arrest or search.” Shadwick v. City of Tampa, 407 U.S. 345, 350, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972). However, the Court also made clear that a magistrate judge must be a public civil officer with jurisdiction. Id. at 349, 92 S.Ct. 2119 (emphasis added).[9] We conclude that the Constitution does not permit military investigators greater power to conduct warrantless entries into the civilian home than their civilian counterparts. See Posse Comitatus Act, 18 USC § 1385 (2000).[10] While a commander has powers similar to a federal magistrate judge, those powers are constrained in scope to persons and places under military control. See Mil.R.Evid. 315(c), Manual, supra.
In this case, SA Coyle correctly believed that he lacked the authority to initially enter and search a civilian residence possessing only a DD Form 553. The DD Form 553, or its predecessor, has long been used to authorize civilian law enforcement to apprehend the named individual as a deserter under Article 8, UCMJ. United States v. Holder, 10 USCMA 448, 451, 28 CMR 14, 17 (1959); United States v. Garner, 7 USCMA 578, 581, 23 CMR 42, 45 (1957). In Garner, this Court noted that the genesis of Article 8, UCMJ, was the separation of civil and military jurisdiction that previously prevented civil authorities from apprehending deserters for a purely military crime. Garner, 7 USCMA at 581, 23 CMR at 45 (citing Kurtz v. Moffitt, 115 U.S. 487, 6 S.Ct. 148, 29 L.Ed. 458 (1885)). However, none of these authorities stands for the proposition that either military or civilian officials acting pursuant to a request to apprehend a military absentee, may do so by entering a civilian residence without a civilian warrant. Moreover, this Court has also held that “a military commander—no matter how neutral and impartial he strives to be—cannot pass muster constitutionally as a ‘magistrate’ in the strict sense.” United States v. Stuckey, 10 MJ 347, 361 (CMA 1981). Among other things, a military commander is not a civilian. In short, the Fourth Amendment mandates that, absent exigent circumstances, law enforcement officials of all types possess a proper warrant or obtain consent prior to entry in off-base civilian homes.
Therefore, we hold that the DD Form 553 is not the functional equivalent of a civilian arrest warrant in the context of entering a *290 civilian home.[11] Thus, SA Coyle’s entry into HM2 Guest’s residence was a warrantless entry in contravention of the Fourth Amendment.[12]
II
Having determined that the entry into HM2 Guest’s residence to apprehend appellant was illegal, we turn now to the pivotal issue in this case, namely, appellant’s consent to the search of his knapsack while still in the residence. Did the illegal entry vitiate appellant’s consent? If so, the contents of the knapsack must be excluded. Given the military judge’s finding regarding the relation between the contents of the knapsack and appellant’s later statements, so too must appellant’s confession be excluded, unless the military judge’s finding in this respect is clearly erroneous. We conclude this particular finding is not clearly erroneous.[13]
The critical inquiry is whether appellant’s consent to search was “sufficiently an act of free will to purge the primary taint of the unlawful invasion.” Wong Sun, 371 U.S. at 486, 83 S.Ct. 407. Thus, Wong Sun requires not merely that statements taken following an illegality meet the Fifth Amendment, U.S. Const, amend. V, standard of voluntariness, but that they also be sufficiently voluntary to attenuate the taint. Brown, 422 U.S. at 602, 95 S.Ct. 2254. After all, it is not whether the evidence would have come to light “but for” the warrantless apprehension, but “whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.” Id. at 599, 95 S.Ct. 2254 (citations omitted). In the instant case, if appellant’s consent, albeit voluntary, is determined to have been obtained through exploitation of the illegal entry, it can not be said to be sufficiently attenuated from the taint of that entry.
In Broum, the Court established a framework for analyzing whether statements made following an unlawful arrest are sufficiently attenuated, or removed, from the taint of the unlawful act. There, police officers investigating a homicide broke into Brown’s apartment without probable cause and without a search warrant while Brown was away. 422 U.S. at 592, 95 S.Ct. 2254. During the course of the unlawful search, Brown returned. Id. The officers, still in the apartment, watched Brown through a window as he approached his door. Id. With guns drawn, they then surprised Brown and arrested him. Id. He was subsequently handcuffed and transported to the police station. Id. at 593, 95 S.Ct. 2254. A little less than two hours after his arrest, and after being read his Miranda warnings, Brown made a statement implicating himself in the homicide. Id. at 594-95, 95 S.Ct. 2254. After several more hours spent assisting the police in finding his accomplice, Brown made a second statement to an Assistant State’s Attorney. Id. at 595, 95 S.Ct. 2254. This statement was made some seven hours after his initial arrest and was also preceded by Miranda warnings. Id. The statements were subsequently used to convict Brown at trial.
Holding that the statements should have been suppressed, the Court, relying ón Wong Sun, noted that “the question of whether a confession is the product of free will [following an illegal arrest] must be answered on the facts of each case. No single *291 fact is dispositive.” Brown, 422 U.S. at 603, 95 S.Ct. 2254. The Court went on to explain that Miranda warnings, while an important factor, were not dispositive in determining whether the statements were obtained by exploitation of the illegal arrest. “The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution.” Id. at 603-04, 95 S.Ct. 2254 (citations omitted). The Court set out three factors also relevant to the inquiry: “[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose andflagrancy of the official misconduct....” Id. at 604, 95 S.Ct. 2254 (emphasis added). So, while the voluntariness of the statement is a threshold requirement to vindicate the Fifth Amendment interest, the Fourth Amendment interest arising from the illegal seizure of the person is vindicated through a consideration of the three factors mentioned above.
Applying these principles to Brown’s situation, the Court concluded that the time period between Brown’s arrest and his first statement along with the lack of any intervening circumstance were insufficient to purge the taint of the illegal arrest. Brown, 422 U.S. at 604-05, 95 S.Ct. 2254. In what appears to be its analysis under the third factor, the Court characterized the police officers’ conduct as having “a quality of purposefulness.” Id. at 605, 95 S.Ct. 2254. “The arrest, both in design and in execution, was investigatory, [and had] the appearance of having been calculated to cause surprise, fright, and confusion” in the hope that some evidence might be discovered. Id.
While Brown involved a confession, this framework has been adopted to address issues of attenuation in the context of consent as well. Florida v. Royer, 460 U.S. 491, 501, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)(consent at issue, “statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will”)(citing Wong Sun, 371 U.S. at 471, 83 S.Ct. 407; Brown, 422 U.S. at 601-02, 95 S.Ct. 2254; Dunaway, 442 U.S. at 218-19, 99 S.Ct. 2248); see United States v. Santa, 236 F.3d 662, 677-78 (11th Cir.2000){Brown factors used to determine whether voluntary consent was obtained through exploitation of illegal seizure); United States v. Melendez-Garcia, 28 F.3d 1046, 1054 (10th Cir.1994)(faetors enunciated in Broum are “especially relevant to determining whether a consent is tainted by a preceding illegal search or seizure”); United States v. Chavez-Villarreal, 3 F.3d 124, 128 (5th Cir.1993)(Brown factors used to determine whether causal chain between consent and prior illegality broken); United States v. McCraw, 920 F.2d 224, 230 (4th Cir.1990)(even if consent to search was voluntary by Fifth Amendment standard, application of Brown factors required suppression); United States v. Taheri, 648 F.2d 598, 601 (9th Cir.1981)(even assuming consent voluntary, it was necessary to apply Brown attenuation analysis).
A. The Brown Factors
The first two factors enunciated in Brown are more related to classic notions of attenuation. See generally, 57A Am.Jur. 2D Negligence §§ 465, 491 (1989 & Supp.2000)(discussing how temporal factor and an intervening circumstance affect remoteness and causation analysis). However, more so than the first two, the third factor is directed at police misconduct and whether such conduct has been employed to exploit the illegality. The Supreme Court has identified this third factor as “particularly” important, presumably because it comes closest to satisfying the deterrence rationale for applying the exclusionary rule. New York v. Harris, 495 U.S. 14, 23, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990); see also United States v. George, 883 F.2d 1407, 1416 (9th Cir.1989). In fact, given the exclusionary rule’s purpose of deterring police misconduct, this factor may be “the most important factor.” Dunaway v. New York, 442 U.S. 200, 226, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)(Rehnquist, J., dissenting).
“The primary justification for the exclusionary rule ... is the deterrence of police conduct that violates Fourth Amendment rights.” Stone v. Powell, 428 U.S. 465, 486, *292 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). When police intentionally violate what they know to be a constitutional command, “exclusion is essential to conform police behavior to the law.” Harris, 495 U.S. at 23, 110 S.Ct. 1640 (Marshall, J., dissenting). However, despite its broad purpose, “the rule does not ‘proscribe the introduction of illegally seized evidence in all proceedings or against all persons,’ ... but applies only in contexts ‘where its remedial objectives are thought most efficaciously served.’” Penn. Board of Probation and Parole v. Scott, 524 U.S. 357, 363, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998)(quoting Stone v. Powell, 428 U.S. at 486, 96 S.Ct. 3037; United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). The Court has heralded the need for caution when employing the rule because it “deflects the truthfinding process” by depriving the factfinder of otherwise relevant and probative evidence. Stone, 428 U.S. at 490, 96 S.Ct. 3037. Unwarranted application of the rule can result in a disparity between the error committed by the police and the windfall afforded the accused that is “contrary to the idea of proportionality that is essential to the concept of justice.” Id. “[Ajlthough the rule is thought to deter unlawful police activity ... if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice.” Id. at 491, 96 S.Ct. 3037 (footnote omitted). Moreover, even the dissenters in Harris suggested that excluding evidence that is the “product of a good-faith misunderstanding of the relevant constitutional requirements ... may result in deterrence of legitimate law enforcement efforts.” Harris, 495 U.S. at 24, 110 S.Ct. 1640 (Marshall, J., dissenting). Thus, in determining whether invocation of the rule is warranted, the Court insists that lower courts strike a balance between “the public interest in determination of truth at trial” and the “incremental contribution that might [be] made to the protection of Fourth Amendment values.... ” Stone, 428 U.S. at 488, 96 S.Ct. 3037.
With these principles in mind, we turn to the circumstances relating to SA Coyle’s conduct in obtaining appellant’s consent to search his bags. The first two Brown factors arguably tip in appellant’s favor. SA Coyle’s testimony indicates that the consent was given within 20 minutes after appellant’s apprehension. Similarly, the only “intervening circumstances” between the apprehension and the consent to search were (1) the administration of appellant’s Article 31 rights, and (2) appellant’s subsequent signed acknowledgement of the right to refuse consent. Taken together, these facts allow a conclusion that the consent given was voluntary. However, as Brown instructs, this is not dispositive of the issue of whether appellant’s consent is sufficiently attenuated from the taint of the unlawful entry.
As for the third factor, there are several facts suggesting the absence of purposeful or flagrant conduct on the part of the NCIS agents in this case. First, after apprehending appellant in the residence, SA Coyle obtained written consent to search appellant’s bags before touching them. As noted earlier, this one-page form advised appellant that he had the right to refuse the search in the absence of a search warrant.[14] We are aware of no legal requirement for tendering such advice to a suspect. Thus, the fact the NCIS agents provided the form with its warning mitigates against a conclusion that the police engaged in flagrant or purposeful conduct to exploit the illegal entry. See United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir.1994)(defendant’s signing of consent form after unlawful traffic stop was “sufficiently an act of free will to purge the primary taint”).
Second, SA Coyle stated that part of his basis for entering the premises to apprehend appellant was his concern for officer safety.[15] *293 We agree with the military judge’s conclusion that the situation encountered by the NCIS agents did not rise to the level of exigent circumstances, as that term is understood in Fourth Amendment jurisprudence. However, SA Coyle’s perception of the situation at the time of appellant’s apprehension is relevant to the application of the third Brown factor. In the real world of law enforcement, officers are often required to make split-second decisions resulting in choices, which, later subject to the frame by frame magnification of appellate review, do not meet Fourth Amendment muster. Nonetheless, decisions taken in good faith, as that term is used in common vernacular, warrant our careful and measured consideration when we assess the purposefulness and flagrancy of police conduct. While not rising to the level of “exigent circumstances”, we do not find Coyle’s concern for safety misplaced, nor evidence of flagrant conduct for the purpose of assessing the third Brown factor.
Finally, because SA Coyle erroneously viewed appellant as a nonresident of the home, he and the other NCIS agents waited outside because they understood they needed a search warrant before entering HM2 Guest’s residence to search for appellant. However, SA Coyle’s testimony strongly suggests he believed the DD Form 553 was the functional equivalent of an arrest warrant. Indeed, the military judge concluded as much, as did the court below. The fact that we now hold that the DD Form 553 is not the equivalent of a civilian arrest warrant for the purpose of entering a civilian home does not suggest SA Coyle acted flagrantly or purposefully in relying on the form.
Unlike the officers in Brown and Dunaway, supra, there is no evidence in the record that SA Coyle knew he was committing a constitutional violation and notwithstanding that knowledge, intentionally entered unlawfully in order to pursue a quest for evidence “in the hope that something might turn up.” Brown, 422 U.S. at 605, 95 S.Ct. 2254. Further, SA Coyle’s three-foot intrusion across the threshold under the genuine, albeit erroneous, belief in the authority of the DD Form 553, does not suggest flagrant or purposeful conduct of the sort the Court in Brown was attempting to address. In Brown, “[t]he impropriety of the arrest was obvious____” Id. We can not say the same for the circumstances surrounding appellant’s apprehension.
While the first two factors are relevant to the analysis, ultimately, in this case a decision to exclude the evidence derived from appellant’s consent comes down to a resolu-. tion of the issue on the third Brown factor. Such a decision must be based on a determination whether SA Coyle’s conduct is the type that the policy underlying the exclusionary rule was intended to deter. It is not evident to us that the SA Coyle’s intrusion across the threshold to apprehend appellant was designed to achieve any investigatory advantage he would not have otherwise achieved by simply waiting for appellant to exit the doorway onto the step outside. The NCIS agent’s conduct here is dramatically unlike the officers’ conduct in Brown and Dunaway. Here, SA Coyle, had probable cause and the inherent authority to apprehend appellant had appellant traversed the three feet between himself and SA Coyle. In short, appellant’s apprehension did not have “a ‘quality of purposefulness’ in that it was an ‘expedition for evidence’ admittedly undertaken in the hope that something might turn up.” Dunaway, 442 U.S. at 218, 99 S.Ct. 2248 (quoting Brown, 422 U.S. at 605, 95 S.Ct. 2254). Nor, was their conduct designed to cause “surprise, fright and confusion.”
Therefore, we hold that appellant’s consent to the search of his knapsack was a voluntary act of free will. Further, we hold that his consent was not the exploited product of the unlawful entry into HM2 Guest’s civilian residence, and thus, it was sufficiently attenuated from the taint of the prior illegality.
Thus, it follows that since we hold that appellant’s consent to the search of his bags *294 was valid, the subsequent seizure of them was valid as well because, in this instance, one can not search without first seizing. Similarly, since the seizure of the bags at the residence was valid, the later search of those bags at the field office was valid.
B. Appellant’s Statement at the Field Office
The manner in which the contents of the bags may have been used to obtain appellant’s confession does not alter the admissibility of the confession. That determination rests solely on the relationship between the inculpatory statements and the earlier unlawful entry by the NCIS agents. Against this backdrop, the rationale of Harris, supra, compels our conclusion that appellant’s statement obtained at the field office was properly admitted.
In Harris, police officers developed probable cause that the defendant had committed a murder, yet they failed to seek either a search or arrest warrant. 495 U.S. at 15,110 S.Ct. 1640. Nonetheless, they proceeded to the defendant’s home and presented their guns and badges. Id. The defendant allowed the officers in, and subsequently confessed to the murder. Id. at 15-16,110 S.Ct. 1640. The officers then transported Harris to the station house where he was administered his Miranda rights. Id. at 16, 110 S.Ct. 1640. There he made a second statement confessing his responsibility for the murder. Id. The issue before the Court was the admissibility of the second statement taken at the station house. Id. After reviewing its rationale in Payton, supra, the Court refused to exclude the confession reasoning that the rule in Payton “was not intended to grant criminal suspects, like Harris, protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime.” Harris, 495 U.S. at 17, 110 S.Ct. 1640. The crux of the Court’s holding is that a warrantless arrest of a suspect in his home does not render unlawful continued custody of the suspect once he is removed from the house. Id. at 17-18,110 S.Ct. 1640. Similar analysis applies in this case because appellant was a resident of HM2 Guest’s residence. As in Harris, because the agents in this case had probable cause to apprehend appellant, he was not in unlawful custody when he was removed to the field office, given his Article 31 rights and allowed to speak. Thus, the statement was properly admitted.
Ill
Post-Trial Delay
Appellant’s trial concluded on August 22, 1997. The trial counsel examined the 668-page record of trial on September 26, 1997. However, the military judge did not authenticate the record until October 31, 1998, over 13 months later. The convening authority took action in the case on April 15,1999, over four months later, and nearly 20 months after the court-martial.
The Court of Criminal Appeals, relying on our precedent in this area, found the military judge’s delay in authenticating the record unexplained. 54 MJ at 748. However, it expressly rejected as speculative appellant’s claim that this delay prejudiced his chances of receiving clemency and parole. Appellant makes the identical complaint in his appeal to this Court.
For the reasons set forth in our recent decision of United States v. Tardif, 57 MJ 219 (2002), we conclude that remand is appropriate in this case.
DECISION
The decision of the United States Navy-Marine Corps Court of Criminal Appeals is set aside. The record of trial is returned to the Judge Advocate General of the Navy for remand to that court for reconsideration in light of this opinion. Thereafter, Article 67, UCMJ, 10 USC § 867 will apply.

. Our resolution of Granted Issue I obviates any need to reach Granted Issue II.

. The military judge found that the knapsack was not "within the 'wingspan' of [appellant] at the time of his apprehension.”

. The military judge specifically found that this was not a search of the bags.

. All Manual provisions cited are identical to those in effect at the time of appellant’s court-martial.

. We find it necessary to address only the first of these contentions. Furthermore, it is questionable whether the record supports the Government’s latter two arguments.

. As a matter of terminology, under R.C.M. 302(a)(1), Manual for Courts-Martial, United States (2000 ed.), "the taking of a person into custody’’ is referred to as "apprehension” and not arrest. “Apprehension is the equivalent of 'arrest' in civilian terminology. (In military terminology, 'arrest' is a form of restraint. See Article 9; R.C.M. 304.)” R.C.M. 302(a)(1), Discussion, Manual, supra. However, apprehensions by military personnel are unlawful if they violate the Fourth Amendment as applied to the armed forces. See id.; Mil.R.Evid. 311(c)(1), Manual, supra.

. While we deem it unnecessary to reach Granted Issue II, we assume, without deciding, that the use of the term "resident” in R.C.M. 302(e)(2)(D), Manual, supra, is coterminous with the term “householder” as used by the Supreme Court in Olson. See Olson, 495 U.S. at 95, 110 S.Ct. 1684.

. Commander Daniel Holloway, USN, USS Gonzalez (DDG-66).

. In limited instances, commanders can authorize searches for individuals on property not within military control, in foreign countries. Mil.R.Evid. 315, Manual, supra; see United States v. Chapple, 36 MJ 410 (CMA 1993)(applying the good faith exception to an invalid search authorization for an off-base apartment in foreign country not within military control).

. Congressional caution regarding military law enforcement in civilian settings is long-standing and is reflected in the Posse Comitatus Act (PCA), which provides, inter alia:
Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.
18 USC § 1385 (2000).
Although the Navy and Marine Corps are not included in the plain language of the PCA, Congress directed the Secretary of Defense to promulgate regulations prohibiting all branches of the military from participating in civilian law enforcement activities as well. See 10 USC 375. In response, the Secretary of Defense promulgated Department of Defense (DOD) Directive 5525.5 (Jan. 15, 1986)(as amended Dec. 20, 1989), regulating the cooperation of military personnel with civilian law enforcement officials. The Secretary of the Navy issued SECNAV Instruction 5820.7B (Mar. 28, 1988), implementing the DoD Directive.
Although the PCA was passed in the context of Civil War reconstruction, Congress has had occasion to reconsider its reach in creating a patchwork framework of express exceptions to it, such as those covering certain training for civilian law enforcement personnel, and the use of military personnel to combat weapons of mass destruction when human life is at risk, and when civilian law enforcement is incapable of addressing the threat. 50 USC §§ 2301-02 (2000).

. We leave undisturbed present law allowing civilian and military officials to apprehend in a public place military members sought pursuant to a DD Form 553.

. The military judge at trial, and the Government in this Court, relied on United States v. James, 464 F.2d 1228 (9th Cir.1972), and Martin v. Commonwealth, 592 S.W.2d 134 (Ky.1979), for the proposition that warrantless entry into the home may be effected by a civil officer with probable cause to believe that a person is a deserter. Since these cases were decided prior to the Supreme Court’s pronouncement in Pay-ton, they do not reflect applicable Fourth Amendment jurisprudence. Whatever value these authorities may have as precedent‘in their respective jurisdictions, we find them unpersuasive and not binding on military courts.

. The military judge found that "[t]he questioning of [appellant] ... at NCIS was based solely on the evidence seized at 1248 Jackson Avenue.”

. Specifically, the form (NISFORM 003/03-80) states: "I have been informed of my constitutional right to refuse to permit this search in the absence of a search warrant. In full understanding of this right, I have nevertheless decided to permit this search to be made.” Unlike many forms, this one is short and clear. It lists the date, items to be searched, start and ending times of the search and the searching officer [SA Coyle].

. Specifically, he testified at the Article 39(a), UCMJ, 10 USC 839(a), session that appellant "was near a room to his right that I didn’t know *293 what was present in the room, so for officer safety issues, not knowing what was around that corner, I immediately took him into custody. I didn’t know if there were any weapons present or not____”